*UNITED STATES DISTRICT COURT*
*DISTRICT OF MASSACHUSETTS*

BARBARA WOODS,

                Plaintiff,

vs.

BAYSTATE HEALTH SYSTEM,

                Defendant.

CIVIL ACTION NO. 04-30010-KPN

**DEFENDANT'S OPPOSITON TO PLAINTIFF'S PRO-SE MOTION FOR A PROTECTIVE ORDER AND DEFENDANT'S MOTION FOR SANCTIONS**

## I.  Introduction

Now, comes Defendant Baystate Health System, Defendant in the above captioned matter, by and through its counsel, Skoler, Abbott & Presser, P.C., and, hereby files this Opposition to Plaintiff's latest Pro-Se Motion For A Protective Order. Defendant also is forced, yet again, to move for Sanctions, based on Plaintiff continued failure to comply with appropriate discovery and the orders of this court.

Defendant filed its original Opposition to Plaintiff's Motion for A Protective Order and Motion for Sanctions when, after Plaintiff responded to several questions, she left the deposition when asked to identify whether a document she had identified was the only charge she had filed with the Massachusetts Commission Against Discrimination against Defendant.  Plaintiff filed a Motion for a Protective Order at that time as well.  In its motion for sanctions Defendant wrote: "While the decision as to how to sanction is within the discretion of the court, and dismissal may be viewed as too draconian at this stage, at a minimum the court should …order that Plaintiff should appear at a deposition scheduled by Defendant, and that she respond *fully*, and to the best of her ability, to all

questions posed by counsel.  Moreover, *the court should make it clear to Plaintiff that a failure to fully comply with such an order will result in dismissal of the case."*(emphasis in original)

The Court thereafter issued an order stating:

…having read the transcript of the deposition, the court is convinced that the deposition was handled in the appropriate manner by Defendant's counsel. Plaintiff's request for the appointment of counsel is DENIED as well: Having considered the respective positions of the parties, the court hereby ORDERS Plaintiff to return to the deposition no later than October 5, 2004, at a time otherwise mutually agreeable to the parties. **Plaintiff shall respond fully and to the best of her ability to all questions posed by Defendant's counsel. Plaintiff's failure to comply with this order could result in the dismissal of her case**. In all other respects, Defendant's motion is DENIED without prejudice.

(emphasis added). Defendant respectfully submits that dismissal is now appropriate.

Forced to reschedule the deposition of Plaintiff within the narrow timeframe allowed by the court's Order, the undersigned resumed the Plaintiff deposition on October 1, 2004.  The Plaintiff, less than two hours after commencing the deposition, announced she had to leave asserting that she had to report to work by 2:00 p.m., and that before that time she needed to drive her mother to West Springfield. Defendant was willing to accept the possibility that Plaintiff, in good faith, was simply unaware of how long a deposition would last.  As a result, the undersigned chose not to seek sanctions at that time.  The Plaintiff's failure to attend her own deposition for the time necessary to complete forced Defendant to seek an extension of time to complete discovery.

At a Case Management Conference on October 13, 2004, the court extended, the deadline, but only until November 5, 2004.  At the conference the Plaintiff was expressly and clearly told by the magistrate judge that she needed to make whatever

personal arrangements were necessary to appear at her own deposition, *and remain at that deposition until its conclusion*, which could last up to five more hours.[1]

When, at the same case management conference, Plaintiff indicated she did not want to answer some of the questions being posed, the court explained, patiently but firmly, Plaintiff's legal *obligation* to answer all questions that did not call for disclosure of privileged information. The court then described, in considerable detail, the limits of what was privileged and the nature of information that Plaintiff could decline to answer.

To comply with the revised scheduling order, the undersigned, after consulting with Plaintiff, scheduled Plaintiff's deposition to be completed on October 22, 2004. On or about October 18, 2004, Plaintiff contacted the undersigned asking that the deposition be rescheduled to accommodate a personal matter. Plaintiff was accommodated and the deposition was rescheduled for October 29, 2004.

---

[1] At the conference the magistrate judge also granted Plaintiff permission to take Robert Williams deposition *at Defendant's expense*. Plaintiff delivered a deposition summons for Mr. Williams to the undersigned's office, and it was hand-delivered to Williams. Mr. Williams indicated he knew nothing about the matter and didn't want to get dragged into it. He did not appear for his putative deposition, which was attended by the undersigned. Plaintiff's deposition testimony made it clear, however, that had Mr. Williams appeared the deposition would have been no more than a fishing expedition at Defendant's expense. Thus, at her deposition she testified:

Q.   Do you know Mr. Williams personally?
A.   No, I did not.
Q.   You never met Mr. Williams, correct?
A.   No, I haven't.
Q.   What information do you believe he has relevant to your case, if any?
A.   The next to your question was if any, I'm hoping he has some information because he worked in the operating rooms.
Q.   Do you have any idea what information you will be seeking from Mr. Williams?
A.   No, it's all mental impressions. I'm going to go with the flow, if he would show up..
Q:   So you never shared a work assignment or shift with Mr. Williams or work alongside him?
A.   No, sir.
Q.   And do you have any reason to think Mr. Williams knows anything about your case?
A.   I'm just going to ask him some questions, you know, from my mental impression and hopefully his answer will be to my benefit.

Plaintiff arrived for the deposition approximately forty minutes late.  As later became clear from her statements recorded at the deposition, Plaintiff, although aware of the court's instructions that she make herself available for up to five hours of deposition so the deposition could finally be completely on the third attempt to do so, had simply chosen to ignore the court's order.  Thus, the transcript indicates the following exchange:

Q.    Do you have a preference about when to break for lunch?

A.    I don't want to go to lunch.  If we can finish by two.  I'd like to go to work.

Q.    Well, we'll keep going for a while.   I can't promise that we will or will not.  We'll go for a while.  **But again, you've made arrangements, in case you can't be there, I take it?**

**A.    No.**

**Q.    Well, the judge told you would have to do that, ma'am?**

**A.    I know what he said.**

(emphasis added))

After she was told that the undersigned would be forced to seek sanctions if she left, Plaintiff petulantly began to respond, in substance, that she "did not recall" to every question posed, sometimes answering before the question could even be asked.[2]

---

[2] The (uncertified) transcript for that date reads as follows:
WOODS, BARBARA - Vol. III (10/29/2004), (Pages 102:-109)
A.   I know what he said.
Q.   And then you showed up forty minutes after the scheduled stop, which was moved up because of your request, after we postponed the deposition at your request, so if we have to go beyond two, I'll expect you to complete the deposition, or I'll seek sanctions.  Do you need to use the phone to call your employer?
A.   Not at this time.  What are sanctions?  Are you threatening me?  I don't appreciate threats.
Q.   Well, whether you appreciate them or not --
A.   It's a shame that you have to go through all of this because somebody discriminated against you.
Q.   Somebody discriminated against me, ma'am?

A.   You know might have.  It's a shame that you, as a person –

Q.   Ma'am, we're talking now about the fact that you you've been advised by myself earlier and by the court to prepare to stay.

A.   I'm going to stay as long as I can.  And if you can reason with me, maybe I can come back on Monday.  I need to be with my job.  I already lost one job, you want to make me lose my other one?

Q.   I think the judge was, frankly, quite explicit sit in his directions, and I think I've been more than fair trying to accommodate your schedule, but we're being here to continue with this deposition to today.  If you do leave it, I'm going to seek sanctions.

A.   You seek what you so desire.  You're threatening.  You're asking the same old questions.  I'm telling you the truth.

Q.   Was there anything else said at that --

A.   No.

Q.   You don't know what meeting I'm asking?

A.   But there wasn't nothing else said.

Q.   For the rest of your employment at Baystate?

A.   No, there was not.  I don't recall anything.

Q.   You don't recall anything else?

A.   No, I don't.  It was a long time ago.

Q.   Do you recall being terminated?

A.   Yes, I do.

Q.   So you do recall some things.

A.   I'm not there anymore.  I'm terminated.

Q.   Well, if you don't recall an answer to a specific question, you can answer it that way?

A.   I don't recall.

Q.   But you have to wait to for the question.

A.   You come on with them.

Q.   I will, one by one.  How long is it, after they transferred to you the emergency department, was it before you had the confrontation with Ms. Harris?

A.   I don't recall.

Q.   Was it the first --

A.   I don't recall.

Q.   You have to let me finish the question.  Was it the very first day that you were on the shift?

A.   I don't recall?

Q.   It was, in fact, though, before you even met Mr. Alves?

A.   I don't recall.

Q.   Didn't you say a few moments ago that, in fact, after the confrontation with Ms. Alves, was your first meeting with Mr. Alves?

A.   I don't recall.

Q.   So you don't know whether that was before --

A.   My blood pressure is going up.  I don't recall.

Q.   You need to take break now?

A.   No, I don't.

Q.   Is your blood pressure precluding you from answering?

A.   Well, my blood pressure leads to strokes.

Q.   I'm asking you whether somehow you're unable to answer questions today?

A.   I'm answering to the best of my ability, as the judge suggested.

Q.   Do you recall having a subsequent meeting about the issue with Mr. Harris?

A.   No, I don't.

Q.   Do you remember a time holding your hands up?

A.   No, I don't.

Q.   Oh, good.  You're sure about that?

A.   Yes, I do.

Ultimately, the undersigned, believing that it would not be beneficial to involve the court yet again in the problems taking of this solitary deposition, agreed to reschedule the balance of the deposition for November 2, 2004.[3]   It was at that time that Plaintiff refused to answer perfectly reasonable, perfectly relevant, non-privileged, questions, contrary to the court's earlier orders. This was done even after the undersigned, *sua sponte*, unilaterally put on the record a *de facto* confidentiality order, in an effort to again cajole Plaintiff to do that which she was legally obligated to do.

Thus, one of the issues involved in the termination of this probationary employee, after less than two months on the job, was her conduct during a meeting with manager Todd Bailey.  At that meeting Bailey was attempting to ascertain Plaintiff's version of an incident involving a confrontation between Plaintiff and another black co-worker, a confrontation that, reports to management had indicated, had reduced the co-worker to

---

Q.   No recollection at all?
A.   I don't recall.

[3] WOODS, BARBARA - Vol. III (10/29/2004), (Pages 138-140)
  BY MR. PRESSER:
Q.   Ms. Woods, apparently notwithstanding the instructions from the court, you have not made previous arrangements to remain for the deposition so we can complete it.  I've looked at my own schedule.  You suggested Monday or Tuesday.  On Monday I could not do that.  After the deposition
that you have scheduled, I have to be in the Berkshires.  Tuesday morning I have to be at MCAD.
I  could complete this Tuesday afternoon if that is preferable today than finishing it this afternoon, so you can make whatever arrangements are necessary to finish Tuesday, but those really are the only times I would have, either finishing as scheduled now or finishing Tuesday afternoon.
…
A.   Well, Tuesday I'll just have to stay and get it completed, if I can reason with me for
    that.
Q.   I'll reason with you in a sense of just discontinuing now and resuming Tuesday at
    12:30.  Certainly if you come at 12:30, we'll be able to finish Tuesday afternoon but not in time
     to get you to work.

tears.[4]  Plaintiff's general conduct at the meeting, including her raising her hand to Todd

Bailey and indicating that she was not going to speak with him, and her abrupt

departure from the meeting, were viewed as unacceptable by her employer.

At deposition Plaintiff contended that she needed to leave the meeting early, to

attend to a young child.  The meeting was held at approximately at 7:00 a.m. and the

undersigned was, as a result, seeking perfectly relevant information that might be used

to discredit Plaintiff's alleged need to precipitously leave the meeting, where her earlier

perceived misconduct was being addressed by Mr. Bailey.  More importantly, the

information being sought, the identity and work hours of the child's parent, is clearly not

privileged, as Plaintiff would be aware from the court's instructions at the case

management conference. Nonetheless, **Plaintiff adamantly, and without justification,**

**refused to provide the information**.

The record reflects the following exchange[5]:

Q.  Ms. Woods, to reorient where we were last time, I think we had suspended the
last deposition when you had to leave, and we were talking about various meetings you
had, and I think, we were, at that time, discussing a meeting you had had, on or about
November 27th, 2002 where Mr. Bailey attempted to ask you questions or give
you an opportunity to explain the situation you had had the night before about
discussing with a co-worker -- and the matter of discussing with a co-worker where you
should or should not be seated.  Do you remember testimony about that meeting?

A.  I recall somewhat.

---

[4] This, at least in the employer's view, reflected a continuation of a pattern that significantly
contributed to the decision not to retain this probationary employee.

[5] At the moment, the undersigned has an "uncertified" transcript. It has been copied without
alteration, unless noted. If the court wishes, copies of the certified transcript can be filed when
received.

Q.   Do you remember you said something about there was a child you had to get home to?

A.   Yes, I had to leave the meeting.  At the onset of the meeting, I informed Mr. Bailey I didn't have long to be in the meeting.  I had no prior notice of the meeting.  I believe I stated last time I was here that Mr. Alves and I had discussed this incident a day before, and I believe that brings me up to date that particular meeting there.

Q.   What child was it that you said you had to go home to?

A.   My baby.  I help raise my nephew, beautiful young boy, lovely and very talented.  I raised him from six months up, and I'm still in his upbringing.

Q.   How old is he now?

A.   He's five.

Q.   And who was watching him then when you were working until seven o'clock?

A.   Eleven to seven.  His parents.

Q.   At his house?

A.   Yes.

Q.   So he was still home with his parents when this meeting was going on?

A.   At seven a.m., she goes -- his mother goes to work, and I take over from there, and I would get home approximately, oh, as fast as I could.  It doesn't take long from Baystate, fifteen minutes or so.

Q.   I take it she doesn't leave him though while –

A.   She waits until I arrive.

Q.   She waits until you arrive?

A.   The later I am the later, perhaps, she would be.

Q.   Where does she work or did she work at the time?

A.   Oh, gees.  She was working for a hospital.

Q.   What hospital?

-8-

A.    Western Mass.

Q.    What was she doing, if you know?

A.    She's a nurse, a CNA nurse.

Q.    A CNA?

A.    Yes.

Q.    And what is her name?

A.    I'm not going to say.  What is this relevance to that, to the issue.

Q.    What is her name, ma'am?

A.    I object to that.  I did the best I could explain to you I do have a child to take care of.  The documentation purports that from New England Farm Workers, I think the relevancy in the matter that I did have to leave, Attorney Presser.

Q.    As the Court instructed you, whether you believe it's relevant or not, unless it's privileged, you have an obligation to answer?

A.    I'm not going to give her information just like you didn't give the information to the parties that I asked for their information to send them my subpoenas to their homes, so I base my answer upon that same knowledge.

Q.    So you're refusing -- you're using the fact that you couldn't stay at the meeting because you had to get home to take care of this woman's child?

A.    My nephew.

Q.    Your nephew?

A.    Yes, sir.

Q.    But you won't give me the woman's name?

A.    No, I won't.

Q.    I will be moving for sanctions on that.  Ma'am, I think, again, respectfully, we've been through this.  The Court has been through this.  I'm entitled to find out that type of information and, frankly –

A.   It's burdensome.  It has nothing to do with the case, so I refuse to answer that.
You can ask for sanctions, and I object to sanctions and I'll file a motion.

Q.   I'm just informing you that is my intention.

A.   Thank you.

Q.   What is her address?

A.   I don't know.

…

Q.   What shift your -- is it sister or sister-in-law?

A.   Sister-in-law.

Q.   What shift does she work at Western Hospital?

A.   I'm not going to answer.

Q.   Once again, I will advise you that I will be seeking sanctions for refusing to
answer questions that may lead to discovery of relevant information?

A.   It's not -- it has nothing to do with the case.

Q.   That's really not your decision to make, ma'am, that's why there's a process in
place where it's you or anyone else or the deponent to answer questions that are posed
unless the court says they're privileged in some fashion?

A.   Would you assume that a person's personal address is privileged?  I have no --
she wouldn't want me to be giving her address or her personal information, Attorney
Presser.  I'm doing my best to relay to you that.  From the documentation that you have,
I did baby-sit the child.

Q.   Let me indicate to you on the record that any information regarding your sister
will be used solely for the purposes of the defense of this case.  It will not be publicized
or used for any other fashion.  I don't know, does that alter your view as to whether
you'll provide the information?

A.   Say again.

Q.   I'm telling you that the information you provide, if you answer the questions, is
for the purposes solely of this case, and it is not my attention to use it for any other

purpose.  That's sometimes what we call confidentiality pledge so the parties can provide information without being fearful that it's going to be misused.

A.   You understand my –

Q.   No, I don't.  I said that, and I'm going to ask you to again to identify this sister's name and address?

A.   I need for you to clarify that again.  Rephrase that.

Q.   Certainly.

A.   Law form.

Q.   It's not a law.  It's a process -- it is information of people that are concerned about sharing, as I said, and as the judge explained, during depositions, witnesses have to answer questions, whether they want to or not.  There are provisions sometimes where parties can limit the use of that information; if you're worried for some reason I'm going to inform other people about your sister's address.  What I've done is expressed to you the purpose of asking this information is solely to be used for the purpose of defending my client in this litigation and we so limited.  And I'm going you with that understanding that is what I've represented to you, whether you're prepared to tell me the name and address of your sister?

A.   No, I'm not.

Q.   And you won't tell me what shift she works at the hospital?

A.   No, none of her privileged information I cannot divulge.


Clearly, the information is not privileged, and could have been thought to be

privileged in good faith by anyone. Clearly Defendant is entitled to information that may

prove useful at trial in disproving any claimed justification for her behavior articulated by

Plaintiff.[6]

---

[6] Thus, for example, the undersigned in good faith believes employment records for Plaintiff's sister in law may be useful in attacking the Plaintiff story.

The Plaintiff's conduct reflects a continuing disregard for and disobedience to her obligations to engage in good faith discovery, and the express orders of this court.  She has acted with utter disregard to the court's orders to appear for deposition prepared to remain at her rescheduled deposition, and perhaps more importantly, and to honestly answer all non-privileged questions to the best of her ability.  The court has been more than patient in explaining her obligations in this regard to Plaintiff, although at the outset of the case it warned her that it would be her obligation to learn and comply with all the rules. Dismissal of the case is now appropriate.

## II. Argument

It is of course axiomatic that a Plaintiff cannot pursue a civil claim while failing to fulfill the obligations to comply with appropriate discovery requests.  It is also clear that the court has discretion to order any and all sanctions that are necessary to protect that process and the rights of all parties. "While it is true that the courts should impose sanctions no more drastic than those actually required to protect the rights of other parties, the language of Rule 37(d) makes clear that the application of sanctions is entrusted to the discretion of the trial judge, **and over leniency is to be avoided where it results in inadequate protection of discovery**."  Diaz v. Southern Drilling Corp., 427 F.2d 1118, 1127 (5th Cir.) certiorari denied 91 S.Ct. 118, 400 U.S. 878, 27 L.Ed.2d 115 (1970)(emphasis added).  *See also*, *Wright & Miller Federal Practice & Procedure*. 8A Fed. Prac. & Proc. Civ.2d § 2284("Trial courts are empowered, under Rule 37, to take all steps necessary to ensure the fairness of discovery to all parties, and to protect the discovery system itself from potential abuse.")

"The administration of the rules lies necessarily within the province of the trial court with power to fashion such orders as may be deemed proper to vouchsafe full discovery for the just, speedy and inexpensive determination of the lawsuit." Wright & Miller Federal Practice & Procedure, supra. *See also*, <u>Barreto v. Citibank, N.A</u>., , 907 F.2d 15  (1st Cir. 1990)(" Discovery orders, other pretrial orders, and all orders governing management of case are enforceable under pain of sanction for unjustifiable violation; trial judges have considerable discretion in selection and imposition of sanctions.").  *The Plaintiff's behavior, including her willful failure to make arrangements to stay at her deposition, notwithstanding being personally instructed to do so by the court, her inappropriately answering that she does not remember before questions were even asked, her unjustified refusal to provide the name of her alibi for leaving a meeting early, although the court earlier instructed her to fully answer questions under penalty of potential dismissal, clearly constitute an unacceptable abuse of the discovery process and disregard of the court's orders. They should be sanctioned by dismissal of the case.*

Moreover, to the extent the case is not dismissed, the Motion for Protective Order must be denied. Thus, for all the reasons cited above, should the case proceed to trial, the Defendant would be entitled to attempt to discredit the veracity of the Plaintiff excuse for leaving the meeting abruptly. It would also be entitled to obtain information, at a minimum relating to interim earnings, from Plaintiff's subsequent employer(s). Seeking such information would not be oppressive or unreasonable and no such claim could be earnestly made.

-13-

Respectfully submitted,

   /s/ Jay M. Presser, Esq.
Jay M. Presser, Esq.
BBO No. 405760
Counsel for Defendant
Skoler, Abbott & Presser, P.C.
One Monarch Place, Suite 2000
Springfield, Massachusetts  01144
Dated:  November 8, 2004          Tel. (413) 737-4753/Fax: (413) 787-1941

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing Opposition To Plaintiff's Pro-Se Motion For A Protective Order And Defendant's Motion For Sanctions was served upon pro-se Plaintiff by first-class, U.S. mail, postage prepaid, on November 8, 2004.

/s/ Jay M. Presser
Jay M. Presser, Esq.