UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BARBARA WOODS,

                    Plaintiff,

vs.

BAYSTATE HEALTH SYSTEM,

                    Defendant.

CIVIL ACTION NO. 04-30010-KPN

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

### Introduction

This Complaint arises out of the decision to end Plaintiff, Barbara Woods',
(hereinafter "Plaintiff" or "Woods") employment with Baystate Medical Center
(hereinafter "BMC" or "Defendant ") approximately seven and a half (7½) weeks
into her probationary period.  The Plaintiff alleges that her dismissal violated Title
VII of the Civil Rights Act and Chapter 151B.  Plaintiff also brings a defamation
claim[1], apparently premised not on statements published by Defendant, but
rather, complaints made by registered nurses to Defendant regarding the
Plaintiff's work deficiencies, rude behavior, and failure to follow directives.

Following her discharge, Plaintiff filed an administrative charge of
discrimination with the Massachusetts Commission Against Discrimination
("MCAD"), which dismissed her claim.  Plaintiff thereafter filed an Appeal which
was also dismissed, after hearing, by the MCAD.  Plaintiff thereafter commenced
this *pro se* action in the federal court.  Defendant has filed a Motion for Summary
Judgment and, as required by D. Mass. L. Fed. R. 56.1, Defendant submits this

---

[1]Additional claims brought by Plaintiff were previously dismissed by the court.

statement of the material facts of record as to which it contends there is no genuine issue of fact.

## **Material Facts Not In Dispute**

Plaintiff Is Hired As A Probationary Employee

1.  In the fall of 2002[2], Plaintiff, a black woman, was working part-time as a housekeeper for $6.50 per hour when her brother, Daniel Woods, informed her of an opening at BMC.  Daniel, at the time and now, was an employee of BMC.  (Pl. V. 2, pp-28-30[3])

2.  Plaintiff submitted an application and was interviewed for the position by Todd Bailey, Manager of Environmental Services.  (Plaintiff V. 2, p. 36; Bailey Aff. ¶ 2)  Plaintiff found Bailey to be pleasant and she was offered a full-time job at $9.45 per hour, plus a night shift differential working third shift.  (Plaintiff V. 2, pp. 38-40; Bailey Aff. ¶ 2)  She was sent a formal offer of employment on October 6 (Ex. 1), and began her employment on October 21.  (Plaintiff V. 2, p. 36)

3.  The offer letter (Ex. 1) in addition to laying out details of the position, notifies the newly hired employee of BMC's Introductory Period Policy, stating as follows:

> *It is the policy of Baystate Health System that all new employees complete an initial introductory period which commences upon hire and extends for 90 days.  The purpose of the introductory period is to monitor and evaluate suitability for continued employment.  If this period is not successfully completed, or at any time during the 90 day period, Baystate Health System reserves the right to terminate your employment.*

---

[2] All dates will be 2002 unless otherwise indicated.

[3] References to the Deposition of Plaintiff will be designated "Pl." followed by the volume number and page.  References to the deposition of Todd Bailey will be designated "Bailey" followed by page number.  References to the deposition of Moira Plumber will be designated "Plummer" followed by the page number.  References to the affidavit of Bailey will be designated "Bailey Aff. ¶ ___."  All deposition exhibits will be attached to the affidavit of Jay M. Presser, and referenced herein as "Ex. __."

The Introductory Period Policy makes it clear that during that period supervisors are expected to monitor the performance of new employees. To continue beyond the introductory period the new employee must receive a "satisfactory evaluation and their supervisor's endorsement to continue in the job."  There is no guaranty that the employee will have the full 90 days to prove that they deserve regular employment; rather supervisors are entitled to recommend termination of a newly hired employee *at any time* during the introductory period.  (Ex. 2; Section IV, A, D)

4.   Since such probationary employees are not yet considered regular employees, the policies that are generally followed for termination of post-probationary employees do not apply.  For example, a post-probationary employee who is terminated can utilize a grievance procedure to contest his or her discharge, the probationary employee cannot.  (Ex. 2)  Progressive discipline is, at least in most cases, used when terminating a post-probationary employee.  In contrast, a decision not to retain a probationary employee does not involve progressive discipline.  An employee may have a perfectly clean record, in the sense that no discipline has ever been issued, and the manager remains free to not offer the employee continued employment should the manager, after having had the opportunity to assess the probationary employee's

performance, believe the new hire should not be offered continuing employment.  (Bailey Aff. ¶ 10)

5.  Plaintiff understood that her probationary period at BMC would last approximately three months, during which "...you are on probation, you do your best and hopefully they hire you."  (Plaintiff V. 2, p. 72)

6.  Plaintiff was not hired following her probationary period.  Rather, on December 9, less than two months into her probationary period, Plaintiff was informed that her employment was ending.  (Ex. 3)  By that time, as set forth in detail below, management had received numerous reports of problems with Plaintiff's performance and/or her interpersonal relationships with co-workers.  These included reports of problems with three black co-workers, Ann Gamble, Caroline Anzeze and Annette Harris, as well as with her group leader, Moira Plummer, who was likewise black.[4]  Management had also received a written petition complaining about Plaintiff's performance, attitude, and behavior signed by Registered Nurses working in the Operating Room, the area to which

---

[4]Defendant presumes that this simple fact is undisputed, based on Plummer's testimony to that effect.  (Plummer 37-38)  However, it was exceedingly difficult to clearly ascertain the facts that Plaintiff was or was not disputing, as evidenced by the deposition exchange below:

Q.   And Ms. Plummer, I apologize, she's an African American as well, is she not?
A.   I don't know what Ms. Plummer considers herself.
Q.   Does she appear to be African American?
A.   You know, Attorney Presser, I would hate to get into history sake of African Americans and characters of --
Q.   Do you recall her deposition testimony, that she was African American?
A.   I don't know what Ms. Plummer said she was.
Q.   Do you have any reason to believe she doesn't know what she is if she testified she was African American?
A.   She could -- I don't know what she puts down on her application.  Ms. Blaney would know that.  Do you have access to --
Q.   If you can answer the question.  Direct your comments to me, please.
A.   I can't vouch for her.  (Plaintiff V. 3, pp. 53-54)

Plaintiff had been assigned.  Todd Bailey, the manager who had hired Plaintiff, had himself been, at least from his viewpoint, the recipient of rude and insubordinate behavior by Plaintiff.  (Bailey Aff. ¶¶ 11, 18)  By December 9 virtually everyone that Plummer had assigned to train Plaintiff had reported that Plaintiff was unwilling to take instructions.  The supervisor of anesthesia had reported that Plaintiff refused to follow appropriate procedures regarding covering her hair. Complaints about Plaintiff were being received "almost daily", a level that was unprecedented in Plummer's fourteen years of employment with BMC. (Plummer pp. 60-64, 71)  These issues were all reported, directly or through Ms. Plummer, to Todd Bailey, who reviewed them with his own manager, Director of Environmental Services, Tim Culhane.  (Plummer pp. 55-59; Bailey Aff. ¶¶ 11, 18)  Employees assigned to train Plaintiff would inevitably report back that they didn't want to work with or train her anymore, ultimately causing Plummer to tell Bailey "I don't know what to do, nobody wants to be around her."  (Plummer pp. 69-70)  When confronted, Plaintiff would inevitably deny culpability, but as Bailey informed her, he had a hard time believing that this many people were making up stories about her.  (Bailey pp. 76-78[5]; Bailey Aff. ¶ 11)

---

[5]As discussed in the accompanying Memorandum of Law, Defendant submits when analyzing a Summary Judgment motion in a discrimination case, the court's "focus must be on the perception of the decisionmaker," that is, whether the employer believed its stated reason to be credible."  Gray v. New England Tel. and Tel. Co., 792 F.2d 251, 256 (1st Cir. 1986). Accordingly, when setting forth the material facts above Defendant has set forth the allegations of Plaintiff's conduct presented to its management at the pertinent time, reports that precipitated its subsequent employment actions.  It is these facts, Defendant submits, that are "material", even in assessing whether there are disputed issues of material fact, and not Plaintiff's version of these events proffered during the discovery.  However, in light of the pro se nature of this matter, and

Ultimately, it was decided that she was not going to be hired as a regular employee, and her tenure as a probationary employee was ended. (Bailey Aff. ¶18)

Don Potter Makes A "Comment" About Plaintiff's Brother

7.    Plummer, who believes that an employee should be trained by a co-worker regularly assigned to the area when possible, assigned Don Potter, Annie Gamble and Caroline Anzeze to train Plaintiff in the Operating Room. She later assigned Annette Harris and Hilda Arroya to train Plaintiff in the Emergency Department. (Plumber pp. 4-6, 9-10, 41-43) Gamble, Harris and Anzeze are black, Arroya is Hispanic. (Plumber pp. 37, 57; Bailey Aff. ¶ 3) Don Potter, who is white, was assigned as her trainer on Plaintiff's first night at work. (Plaintiff V. 3, p. 17)

8.    Potter was perceived by Plummer as a humorous person, who frequently jokes with co-workers. (Plumber pp. 15, 74) No other employee, including the black employees who had worked with Potter before and after Plaintiff's brief employment, have ever reported having a problem with Potter. (Plumber 46; Bailey Aff. ¶ 7)

---

recognizing the court's apparent desire to ensure that Plaintiff's *pro se* status does not unduly prejudice her, Defendant will set forth in the margin or body herein, Plaintiff's version of the significant events, as provided at deposition, where they differ from the facts stated to be undisputed. It is the reports to the decision makers that are undisputed; and Defendant does not submit that Plaintiff, then or now, was in agreement with every detail of the reports. Significantly, however, it is clear that there is no dispute that Plaintiff encountered each of these problems. Thus, while Plaintiff's account of a particular confrontation may differ somewhat from the facts reported to Bailey by the incumbent employee, it is undisputed that the incident, in some form, occurred and that it was reported to the decision makers, in the fashion set forth above. The Defendant submits that, in the context of this case, these undisputed facts are more than sufficient to establish the absence of a genuine issue of *material* fact.

9.   The first four hours of Plaintiff's training by Potter were uneventful.
     (Plaintiff V. 3, p. 19)  As lunch hour approached, Plaintiff decided she
     wanted to eat lunch with her brother, Danny, and asked a co-worker if he
     knew where he was.  (Plaintiff. V. 3., pp. 20-21)  It was soon thereafter
     that Potter made what Plaintiff describes as a "racially motivated
     comment" or racial slur.  (Plaintiff V. 3, p. 24; Bailey pp. 27-28)
     Specifically, according to what Potter later told Bailey, upon spotting
     Plaintiff's brother he indicated "here comes your ugly brother's mug."
     (Ex. 4; Bailey Aff. ¶ 5)  Plaintiff's recollection, only slightly different, is
     that Potter stated "here comes your ugly brother."  (Plaintiff V. 3, pp. 24,
     78-80; Bailey Aff. ¶ 5; Bailey 11; Ex. 5)

10.  Although she made no immediate comment, based solely on this
     statement Plaintiff immediately concluded that Potter did not like black
     people.  (Plaintiff V. 3, pp 24- 31)  Following lunch, Plaintiff confronted
     Potter over what she considered to be a racial slur, indicated that she
     thought "he must have issues".  (Plaintiff V. 3, pp 24-31; Plaintiff V. 4, p.
     17)  Potter indicated that he had just been joking, an explanation
     rejected by Plaintiff.  (Plaintiff V. 3, pp 24-31)

11.  The next day Bailey learned of the comment and that Plaintiff had been
     offended.  He confronted Potter who did not deny saying "here comes
     your ugly brother's mug," but indicated that he had just been joking with
     Plaintiff.  Potter indicated that he believed "Her brother and I are friends
     and I felt there was no problem saying it."  (Bailey 70; Bailey Aff. ¶ 5)

Bailey believed that "obviously it was something he shouldn't have said" but rejected, then and now, Plaintiff's assertions that it was a racist comment.  (Bailey pp. 21-22, 71; Bailey Aff. ¶ 7)

12.   Plummer also investigated the issue, speaking with Plaintiff, Potter and the two employees, who may have overheard the comment.  Plummer recalled at deposition that Plaintiff had told her that Potter had pointed to her brother and said, "Hey, look.  Look at Ugly mug" or something like that."  (Plummer p. 47)  Plummer suggested to Plaintiff that Potter "must have been joking" but further indicated that it was something he should not have said.  (Plaintiff V. 3, p. 52)

13.   Plummer, during that same shift, then spoke with Potter.  (Plummer p. 49) Potter indicated that he had only been playing with Plaintiff but that "when he had seen the reaction on her face, he new he had made a mistake." (Plumber p. 49)  Plummer also spoke with Caroline Anzeze and Annie Gamble, who indicated that it was their impression that Potter had just been joking.  (Plummer p. 74)

14.    Plaintiff subsequently indicated to Bailey that she thought it was a prejudiced statement.  (Plaintiff V. 3, p. 31; Bailey Aff. ¶ 6)  Bailey tried to explain that Potter never intended it to be a racial statement.  (Bailey p. 32, Bailey Aff. ¶¶ 7, 8)

15.   Several weeks later Bailey spoke with Plaintiff and indicated that it was reported to him that within the department she had been calling Potter prejudiced.  She asked who was saying such things, and Bailey

indicated it was Ms. Gamble.  Plaintiff denied making the statement to

Gamble, although she had "every right" to think of Potter as prejudiced.

(Plaintiff V. 3, pp. 37-39)  A meeting was held with Gamble and Ms.

Plummer, along with Bailey and Plaintiff.  (Pl. V. 3, p. 42)  Gamble

responded that she did not hear that herself, but that she had had heard

about such statements  that she had relayed that to Bailey.  (Pl. V. 3, p.

43; Bailey Aff. ¶ 8)  According to Plaintiff, Potter claimed that he had

already apologized at which time she responded, "you never apologized

to me for what you said. My feeling is the same, you wasn't joking.  I

didn't know you".  The accusations agitated Potter to the point he

indicated he was going to resign.  (Pl. V. 3, pp. 57-59; Pl. V. 4, 21-22;

Bailey Aff. ¶ 8)

16.  Potter assured management that in the future he would not make

comments like the one that had drawn the ire of Plaintiff.  He was

formally notified that such statements were "inappropriate" and that it

would not be accepted in the workplace.  (Ex. 5; Bailey Aff. ¶ 8)

17.   Plaintiff later had a meeting with Tim Culhane, the Director of

Environmental Services.  The Director indicated that he, too, felt what

Potter had said was rude but not racist.  Culhane, according to Plaintiff,

indicated "It's how you interpret it."  Culhane indicated that it was very

rude and the words used constituted an inappropriate comment.

Culhane informed Plaintiff that the matter had been addressed with

Potter.  (Plaintiff V. 3, pp. 99-100)

18.  Notwithstanding the Defendants response to the inappropriate comment by Potter, Plaintiff believes that she was terminated as a result of a "conspiracy" stemming from the comment Potter made about her brother on the first day of her employment.[6]  (Plaintiff V. 3, pp. 62)

<u>Co-Worker Ann Gamble, In Tears, Asks Not to Work with Plaintiff Anymore</u>

19.   Ann Gamble was one of the third shift custodians that had been assigned to train Plaintiff in the PACU.  When Plummer went to Gamble to check on Plaintiff's progress, Gamble indicated that Plaintiff didn't want to go by the rules or by the proper instructions for cleaning the area.  It was, according to Gamble, being noticed by the Registered Nurses in the department. (Plummer pp. 54-56)  As always, Plummer relayed the information to Bailey, who spoke with Gamble.  (Bailey Aff. ¶ 11)

20.  Gamble informed Bailey that by the third day of training Plaintiff was accusing Plaintiff of watching over her "like a slave", and criticizing her

---

[6](Plaintiff V. 4, pp. 44-45) (asked if she called her manager a two faced hypocrite Plaintiff states:

A.  …-- I asked him did he know what hypocrites were.  I did not call the gentleman a two-face lying hypocrite.  I wouldn't do that.  I think that's very disrespectful.  But I asked him did he know what a hypocrite was.

Q.   And what else did he say or you say about being a -- do you know what a hypocrite is?

A.   I asked him did he know what a hypocrite was, and he might have said just what he said here, I'm sorry that you, you know, feel this way.  Well, it brings back those emotions so I keep -- you know, he might have said that he was sorry that, you know, what he said here, he might have said he was sorry.

Q.   Sorry that you felt that way, is what it says.

A.   That I asked him what a hypocrite was, or what have you.  I would not call people two-faced lying, you know, that's not -- that's not me.  But I did ask him, did he know what a hypocrite was, because Mr. Culhane stated that he would not hold Potter's racial slur against me, and in all fairness, I was asked -- I was being terminated because of that, and I was not happy.  Excuse me.  No, not in the least.

Q.   You had been terminated because Mr. Potter, on the first night of your employment, had made a comment to you about your brother?

A.   Yes, sir….

trainer for always checking up on her.  Gamble indicated that when she had to cover another area Plaintiff accused her of wandering around the hospital and not doing any work.  When, near the end of her PACU training Gamble indicated to Plaintiff that she had left her own to see if she could handle the assignment, accused Gamble of just being lazy.  Gamble, in tears, pleaded with Bailey not to have to work with Plaintiff again.  (Ex. 6; Bailey Affidavit ¶¶ 11, 12)

21.  Plaintiff, for her part, does not dispute that her co-worker, Gamble, complained to Bailey about Plaintiff asking her about her whereabouts, although she doesn't "recall calling Gamble lazy for not helping." (Plaintiff V. 3, pp. 45-48)  When asked about the incident, Plaintiff responded by telling Bailey that she had found Gambles' work area "to be dusty", an accusation that further angered Gamble.  (Plaintiff V. 3, p. 49[7])

Plaintiff Reduces Her Team Leader to Tears

22.  Periodically, Plummer would inadvertently refer to Don Potter as "Dan" and Plaintiff's brother, Dan Woods, as "Don".  She had always apologized to whichever individual she had referred to as the wrong name.  She had never made this mistake in Plaintiff's presence. (Plummer pp. 52-53)

---

[7]Plaintiff has had difficulty with co-workers assigned to train her at other employers as well.  Thus, according to Plaintiff, when working for a prior company, when confronted with mistakes she was making she blamed the mistakes on the poor training she was receiving from a co-worker.  The co-worker learned of this, and was, according to Plaintiff, so irate that she challenged her to fisticuffs and used a racial epithet.  Plaintiff quit and filed an unsuccessful charge of discrimination with the Massachusetts Commission Against Discrimination.  (Plaintiff V. 2, pp. 18-21)

23. Plummer attended a meeting with Bailey and Plaintiff to review the difficulties that Plaintiff was having with Ann Gamble.  Although seemingly not at all pertinent to a discussion of difficulties Plaintiff was having with Gamble, Plaintiff began to discuss the fact that Plummer would call her brother by an incorrect name; upsetting Plummer with what Plummer believed was an accusation of intentional wrongdoing.  Not believing "what was coming out of Plaintiff's mouth", Plummer, in frustration, began to cry.  (Plummer pp. 51-52)

24. For her part, Plaintiff does not deny that Plummer cried at a meeting with herself, Gamble and Bailey.  However, when asked what prompted Plummer's weeping, Plaintiff initially claimed that she "doesn't know why she was crying.  She's a grown woman.  She could have been in pain.  Was she in pain, you think?"  (Pl. V. 3, p. 65)  Later, Plaintiff suggested that she had not done anything wrong, it was "the truth" or Ms. Plummer's own makeup that reduced the group leader to tears.  (Plaintiff V. 3, pp. 65-69[8])

---

[8]Q.   I think her deposition testimony, if I try to refresh your memory, is that you accused her of intentionally calling Danny by another name.  You remember that deposition testimony?
A.   She would cry because I accused her --
Q.   Well, that's what she testified to, that you were accusing her of slurring your brother by calling him by the wrong name when she had just made a mistake.
A.   No, sir, I never used those words slur.  What I brought to her attention --
Q.   Yes.  Thank you.  What did you bring to the attention at this meeting about Ms. Plummer?
A.   The truth is the light.  The truth must have made her cry, because she admitted in the deposition that she was the one that called Daniel Don and Don Danny, that she was the one that off said that alleged joke that they're pretexting, that was part of the claim.
Q.   What truth is it that you brought to the light at this meeting that made Ms. Plummer cry?
A.   I didn't -- what made Ms. Plummer cry was that she suggested in the meeting, oh, I work so hard, and she suggested on her deposition, people want to see me fail.  I don't even know Ms.

<u>Caroline Anzeze Has Difficulty Working with Plaintiff</u>

25.  Caroline Anzeze was yet another black custodian working in the Operating Room who was asked by Plummer to help train Plaintiff.  A short time after the two had worked together Bailey was informed that Anzeze wanted to talk to him about an issue that had arisen with Plaintiff. (Bailey p. 75)  When he spoke with Anzeze, the employee recounted how she had accidentally touched Plaintiff.  Although it was clearly an accident, Anzeze indicated Plaintiff had responded angrily, asking her what she thought she was doing, and insisting that she never touch her again.  (Bailey Aff. ¶ 12; Ex. 7)

26.  For her part, Plaintiff admits that Plaintiff touched her and that she asked her never to touch her again.  She also admits that she asked Anzeze what she thought she was doing.  (Plaintiff V. 3, p. 70)  Plaintiff embellishes the difficulties between the two with a claim, made at her deposition, that Anzeze had intentionally tried to kick her and that she had spit on her food.[9]  (Plaintiff V. 3, pp. 70-79)

---

Plummer.  I don't want to see anyone fail.  It's her own personal makeup that made her cry.

[9]It is unclear whether Plaintiff contends that Anzeze spit on purpose, even though it is clear that the co-worker apologized immediately.  Plaintiff's deposition testimony regarding the incident is as follows:
  A.   No, she spit in my food.  I thought that quite disgusting.
  Q.   Tell me about that.
  A.   They were at the break table there, and she was talking and spit got in my food.
  Q.   Did she spit on purpose, do you think?
  A.   I would hope not, you know, but she called it an accident.
  Q.   You don't think it was?
  A.   I wouldn't do anyone like that, so.
  Q.   She was talking and some saliva came out of her mouth and landed in your food, in other words, in the process of talking?
  A.   Yes, we could say that.
  Q.   And she apologized that it had happened?

<u>The Operating Room RNs Submit A Written Complaint About Plaintiff</u>

27.    In late November, the nursing staff in the Operating Room gave a

handwritten document to Plummer, who in turn gave it to Bailey.

(Plummer 60)  The three page document (Ex. 8) was signed by eight

different nurses from the Operating Room, and set forth various

complaints about Plaintiff's work performance and conduct.  The mere

fact that such a written petition of complaint was sent by the nursing staff

was most unusual, and Bailey took it indicative of the depth of their

concern regarding problems relating to Ms. Woods' in the operating

room.  (Bailey Aff. ¶ 13)

28.    The petition complained about poor cleaning by Plaintiff and her failure

to follow procedures and directives to cover her hair properly and not

touch items with dirty gloves, matters that affect the required sanitary

conditions of the operating room.  Thus, the note reflected that Plaintiff

would simply spray and wipe off the particular disinfectant used, which

had to be left on the surface for a period of time to be effective as a

---

A.   Yes, she apologized.  I asked her --
Q.   What did you ask her?
A.   Excuse me?
Q.   What did you ask her?
A.   I might have asked her why did you do that.
Q.   And she said?
A.   She used the words "I'm sorry."  She just said, "I'm sorry," and I moved away from her.  I said, "That's my food.  Now I can't eat it," and I thought it was very rude.
Q.   Did you think she did it on purpose?
A.   Again, I said I hope not.
Q.   Did you think she had?
A.   I don't know what her reasons was.  Like I said, I hope not.
Q.   Well, when we're talking about this issue where she touched you, you complained that she had done these bad things to you earlier, including spitting on your food?
A.   She did.
Q.   But you're not suggesting that was intentional, that she spit on your food?

14

sanitizer.  It also noted Plaintiff's poor personal interactions with others,

and perhaps most relevant to Plaintiff's chances for success, the fact

that Plaintiff simply would not listen to the instructions that Annie Gamble

was trying to convey.  Consistent with what Bailey had been hearing

regularly from Plummer and the employee trainers from the very

beginning of Plaintiff's employment, the note concluded by stating:

> *"Barbara was very disruptive to this environment.  She was rude &*
> *offensive when speaking with her.  She was especially*
> *inappropriate and rude when speaking with Annie.  Annie was*
> *trying to teach her how to clean this room the right way.  Barbara*
> *always had some curt answer back.  She did not care who she said*
> *it in front of."*

(Bailey Aff. ¶ 13)

29.    This complaint from the Registered Nurses, and a summary of the

Complaint prepared by Bailey (Ex. 8) serves as the basis for Plaintiff's

defamation claim.  (Plaintiff V. 2, pp. 48-57)  The documents were given

by Plummer to Bailey, and then up the chain of command to Bailey's

supervisor Culhane.  (Bailey Aff. ¶ 14)  Prior to the filing of legal

proceedings the document was shared by Bailey only with his own

immediate supervisor, Tim Culhane.  (Bailey Aff. ¶15)  Plaintiff admits

that she has no knowledge of the document being distributed or shown

to anyone other than her supervisors.  (Plaintiff V.2, pp. 48-57)

<u>Within Hours of A New Assignment Plaintiff Reduces Annette Harris To Tears</u>

30.    Shortly after receipt of the complaint from the RNs, and after Bailey had

consulted with Culhane, it was decided to give Ms. Woods a fresh start

---

A.   I don't know what her reason for doing it, you know, she said --

and train her in the emergency department.  The decision to try Plaintiff in the emergency department was made with the hopes that Plaintiff would do better there than she had during her time in the Operating Room.  (Bailey ¶15)

31.  Thus, it was clear to Bailey and Culhane that Plaintiff could not remain in the Operating Room where, by this time her behavior had alienated both RNs and the custodians assigned to train her in the operating room cleaning procedures, to the point that neither Ms. Anzeze nor Ms. Gamble wanted to work with Plaintiff anymore.  Plummer and Bailey were receiving an unprecedented level of complaints regarding Ms. Woods' performance in the Operating room.  It was hoped that Plaintiff could have better success in a different area.  (Bailey Aff. ¶ 15; Bailey p. 79; Plummer p. 66)  She didn't.

32.  Rather, on Plaintiff's very first night, only a few hours into her first shift in the Emergency Department, Plaintiff had an altercation with Annette Harris, a black custodian from Jamaica.  The incident had reduced Harris to tears when she reported the confrontation to Plummer, indicating the Plaintiff was not listening or following her instructions, and in fact, had been rude to her.  Plummer reported to Bailey how Harris had come to her in tears regarding a problem.  (Plumber pp. 12, 67-70)

33.  Bailey went to discuss the situation with Harris.  Harris, a valued employee, became so upset when discussing the matter that she began to cry again during her discussions with Bailey.  Ms. Harris relayed to

Bailey that she had observed Ms. Woods sitting in an area of the emergency department where custodians are not supposed to be seated.  She indicated that she had attempted to inform Plaintiff of that fact but that Plaintiff snapped at her, telling her that it was none of Harris' business where Plaintiff was sitting.  Perhaps surprised by this curt response from a probationary employee, Ms. Harris reported to Bailey, she then told Ms. Woods that if someone had told her that she was sitting in an area that she was not supposed to be in, she would have apologized, and said that she didn't know she was not supposed to be there.  According to Harris, Plaintiff responded, "Oh well, that's just you." It was clear to Bailey that Harris was greatly upset by this episode and the disrespect shown to her by Plaintiff when Harris was, appropriately, trying to inform Plaintiff that she should not be sitting in the patient waiting area.  (Bailey Aff. ¶ 16; Bailey pp. 80-81; Ex. 9)

34.  While Plaintiff contends she had difficulty understanding Ms. Harris due to her Jamaican accent, there is no dispute that Harris approached Plaintiff that evening regarding where Plaintiff was sitting.  There is no dispute that in response, Plaintiff told Harris that it was "none of her business."[10]  Nor does Plaintiff deny that Harris then indicated how she

---

[10]Q.   At some point you say you told her, is that your business?
    A.   Yes, I did at some point, **I said, I didn't think it was none of your business.**
    Q.   Did you prior to that making that statement, I don't think it is any of your business, did you understand what Ms. Harris was saying to you that was your response?
    A.   I don't recall understanding her diction too well, but **I did mention to her, I don't think it's none of your business.**
    Q.   What did you think was none of her business?
    A.   What she was yelling for.
    Q.   You're sitting here today testifying that when you say, It is none of your business,

would have  responded if someone had told her that she was not

supposed to sit in an area she was sitting in.  It is also undisputed that

Plaintiff, believing Harris' comments to be a "form of dictatorship",

Plaintiff responded:  "well that's just you."[11]  (Plaintiff V. 3, pp. 82-84)

---

you didn't understand what she was talking about?
  A.  I'm talking about her accent was kind of deep and my thought of her yelling first off was what made me -- I didn't understand why she was yelling words; I didn't know what was going on, I thought somebody was being hurt.  There was other people there so I don't know why she was yelling, she could have been yelling at a child.  I hope not but there was some other people there and as she come closer, I understood a little more, are you talking to me, what are you saying, and she -- whatever she said led me to believe that she meant that this area is people don't sit there and I said, they don't sit here, and I seen people sitting there all the time, so **I didn't feel it was none of her business, why should I explain why I was sitting there, you know, it was only a brief second.**
  Q.  So you understood she was informing you that you shouldn't being sitting there?
  A.  Attorney Presser, I understand and I was -- my suggestion and answer to that question is from the beginning when I met Ms. Harris at the park, she said she had no authority to bring me up on the area to train me or to do anything, so when she come around the corner talking, you know, she had no authority to tell me anything why she speaking.  I mentioned that to Mrs. Plummer when she stated to me she couldn't bring me up on the area to -- said what did she say to you and I said, she did say those things, I had to wait actually about maybe 20 minutes before Ms. Plummer arrived to bring me up.  I was kind of leery about whatever she was saying.
  Q.  So because you're saying she told you she is not your supervisor or trainer that evening --
  MS. WOODS:  Objection.
  A.  No, no.  She said she had no authority.
  Q.  Because she said she had no authority over you, when she came and told you shouldn't be sitting in that area you thought it was okay to respond, it's none of your business?
  A.  Because she acted inappropriately toward me as a co-worker and a team player, **I responded to her, it's none of your business why I'm sitting there**.
  Q.  Ms. Harris is herself black, I take it?
  A.  I don't know if Jamaican consider themself as that, you have to ask her.. (Plaintiff V. 2, pp. 84-87)
  *See, also*, Plaintiff V. 2, p. 29, "What I said to her was not anything that was rude or derogatory.  **All I said, Is that your business**."  *See, also,* Plaintiff's sworn charge of discrimination before the Massachusetts Commission Against Discrimination, indicating that she was told by Ms. Harris that she should not be sitting there because it was for patients, and that she **responded that it was none of her business that I was sitting down**.  (Ex. 10 at ¶ 12) (Emphasis added throughout footnote).
[11]Q.  Do you recall any, when you had the incident with Ms. Harris, her saying that if somebody had told me not to sit here, I wouldn't do it, and responding, well, that's just you, or words to that effect?
  A.  Yes, I recall her thoughts -- what I should say to her, yes, I do, her diction.
  Q.  Well, do you recall the part I just read to you, that she indicated, if someone had told me not to sit here, I would listen and not sit there?
  A.  Yeah.
  Q.  She said something like that?
  A.  She said something similar to that.  I recall her interpretation of how I should speak to her, her dictatorship.

Plaintiff is Rude and Insubordinate to Bailey

35.    After speaking with Harris, and seeing her reaction to the incident with

Plaintiff, Bailey, who was still Plaintiff's direct supervisor although she

was being trained in the Operating Room, decided to hold a meeting with

Plaintiff to ascertain her version of what had transpired.  A meeting was

held on November 27, at the end of her shift, with Burt Alves, another

supervisor, Bailey and Plaintiff.  When told that, Bailey perceived this as

a serious issue that she should respond to, Plaintiff asked to be left

alone and claimed that she was being harassed. (Ex. 10 ¶ 13; Bailey Aff.

¶ 27; Ex. 11; Bailey p. 60; Plaintiff V. 2, p. 78)  She then began to talk to

Alves and to ignore Bailey.  When Bailey indicated that it was advisable

for her to address what had happened with Ms. Harris, Plaintiff held her

hand up in front of Bailey, and told Bailey, "I am not talking to you, I am

talking with Burt [Alves]."  Bailey responded that he remained her

supervisor and was entitled to ask her questions.  (Bailey Aff. ¶ 27; Ex.

11; Bailey pp. 61, 53)  Plaintiff continued to ignore Bailey and soon

---

Q.   Her dictatorship?
A.   Yes.
Q.   You thought she was a dictator, acted like a dictator?
A.   I don't know.  When you suggest what other people should put in their mouth and words, I thought that was somewhat taking away their freedom.
Q.   So when she suggested how she would respond if someone told her where she should or should not be sitting, you thought she was acting like a dictator, taking away your freedom?
A.   It said that if anyone had told me that I couldn't sit, I would say it.  She said well, she was saying.  That's her personal opinion.  I have a right to speak freely, so.  I said, "Well, that's you.  That's honest.  That's you're opinion."  That's what I mean by that statement.
Q.   So you made that statement, "Well, that's just you"?
A.   Yeah, that's a comment, statement, that is her.  That's her opinion.  She has her opinion.  I have one.  I didn't think as a co-worker her opinion weighed more than mine, Attorney Presser.

thereafter she got up and unjustifiably[12] left the meeting.  Bailey viewed

Plaintiff's behavior as both rude and insubordinate.  (Bailey Aff. ¶27;

Bailey p. 60)

36.  Plaintiff does not recall whether she was asked to respond to the

allegations as to what had happened, but asserts that if she were she

would not have responded.  She did not contest that she held her hand

up, claimed she was being harassed, and indicated that she only wanted

to speak with Alves, who she now perceived to be her only supervisor.

Nor is there any dispute that Plaintiff then, without justification, got up

and left the meeting.[13]

---

[12]Plaintiff, at deposition, claimed that she needed to leave the meeting to care for a child, but refused to provide information that would allow Defendant to test that claim.  Defendant moved for sanctions, and on November 9, 2004, this court issued the following order:

> *Accordingly, the court ALLOWS Defendant's request for sanctions as follows:  Plaintiff shall either provide Defendant a sworn affidavit by November 17, 2004, containing the following information regarding her sister-in-law -- her name, address and place of employment at the time of the incident in question -- or be barred thereafter, either in response to a motion for summary judgment or at trial, from claiming any justification for having left a meeting with Mr. Alves early.  So ordered*

Plaintiff has not produced any such affidavit.  *See*, Presser Affidavit ¶ 20.  Accordingly, based on the court's order, she cannot now claim that she was "justified" in walking out of this meeting.

[13]Her testimony is set forth below:

Q.    Then there's the next paragraph where they said, given -- what they viewed as the severity of the situation, they wanted to give you two minutes to explain your side of the story and what happened with Ms. Harris?

A.    Yes.

Q.    Did they, in fact, do that, they said, "We want to hear your side of what happened"?

A.    I don't recall, but if they did, I wouldn't have gave them no answer.

Q.    Why would you have not given --

A.    It's just my religion.  I wouldn't have gave them no answer.

Q.    Your religion would have precluded you from responding to Mr. Bailey when he asked for your side of what happened in the confrontation with Ms. Harris?

A.    That's what I believe.  I just don't -- it's how I believe, Attorney Presser.  We just don't bring people, you know, I just wasn't raised that way, but what I would have said to him was this, it was early morning, I had no prior notice of this meeting, that I had to go home and take care of the child, my baby, so I had to leave.  It was like five of seven, meeting was going on. I couldn't dear leave the baby, and I said -- he was talking, I'm trying to explain to my new

37.   Plaintiff received a formal disciplinary warning for her conduct with Ms.

---

supervisor, I'm trying to talk to Burt to get some assistance to help me, but Burt didn't help me so I had to leave.  I think at this time I told him -- I would have told him you are harassing me, because he had no business involved in this.  Me and Burt had discussed it.

Q.   So you didn't think that Mr. Bailey had any business discussing it?

A.   That's correct.

Q.   And you told him that?

A.   No, I did not tell him that.  I'm telling you that, personally.

Q.   But you told him he was harassing you?

A.   Yes, I did tell him that.

Q.   And did you, in fact, then tell Burt, say to Burt, "Do you feel I would do something like that," to Burt?

A.   I don't recall that.  He wrote what he wrote.

Q.   You don't have a recollection one way or another?

A.   I just calling asking Burt for some assistance and him saying he couldn't help me.

Q.   Do you remember saying to Mr. Bailey, "I'm not talking to you.  I'm talking to Burt"?

A.   Mr. Bailey, as you know, from your -- from the deposition, is a very fast talker.  He was talking so fast.  And spitting out words, and I could barely understand him.  I think at some point I asked him to hold on a minute.  Wait a minute.  And that's what he stated, that he called it insubordinate.  And there was conversation while I was speaking to -- who I felt I was my supervisor.  He told me welcome aboard.  He didn't tell me I had two supervisors when he welcomed me aboard and had I had --

Q.   Let's leave aside for a moment who was your supervisor.  Do you remember telling Mr. Bailey, "I'm not talking to you"?

A.   I was talking to Burt at that time.

Q.   And when Mr. Bailey asked you a question or said something to you, you told him, "I'm not talking to you.  I'm talking to Burt"?

A.   No.

Q.   Did you say, "I'm not talking to you"?

A.   I just said, "Hold on a minute," put my hand up.

Q.   You put your hand up?

A.   Yes.  You know, like we do in talking, gesturing, we speak with hands.

Q.   And you put your hand up toward Mr. Bailey when he had asked you a question?

A.   Of course not.  Like this, you know.

Q.   So Mr. Bailey is trying to get your side of the story and you say "Hold on" and hold your hand up?

A.   No, I was talking to Burt.  Mr. Bailey is speaking over my head.  Mr. Bailey is standing up in a very small office.  I'm sitting in the chair.  Burt is right here.  I'm directing all my attention to my new supervisor.  I'm looking for assistance.  Bailey is shouting out words and singing and whatever he's doing.

Q.   He's singing, ma'am?

A.   What I mean by singing words, when you talk fast, you say -- sometimes you talk so fast.

Q.   What do you mean you're looking for assistance?

A.   I wanted some help from my new supervisor, to ask him to stop harassing me, because I don't know his answers.  I didn't want to respond to this.  I had already spoke with him, with Mr. Alves, and he didn't seem to have a problem with it.

Q.   So because you spoke to Mr. Alves, you didn't feel there was a need --

A.   That's correct, because Mr. Bailey went out of his way.  He's the supervisor for the OR.

Harris and at the meeting with Bailey.  (Bailey Aff. ¶ 27, Ex. 12)

BMC Decides Not to Continue Plaintiff's Probationary Employment

38.   Soon thereafter, Bailey and Culhane reviewed Plaintiff's employment

status.  The review was precipitated by the fact that the same type of

problems Plaintiff had experienced in the operating room had arisen with

Harris virtually immediately after they had transferred Plaintiff to the

Emergency Department, in an attempt to give her an opportunity for a

fresh start, and in light of her inappropriate behavior at the meeting of

November 27.  Given these most recent events, and the history of the

problems she had had when in the Operating Room, they believed that

"there were just too numerous occasions where she had issues with the

training and different employees at this point."  (Bailey p. 91)  Her

behavior was unprecedented for a probationary employee and viewed as

"way beyond normal behavior for any employ[ee] to…have this many

kinds of incidents with this many different people and be this

confrontational". (Bailey p. 91)  Given Plaintiff's behavior, her denial of

any culpability[14], the fact that whenever she was criticized she

responded by attacking others and rejected any need to change her own

behavior, her managers could see no reason why they could expect a

_____

(Plaintiff V.3, pp. 126-129)
[14]Indeed, Plaintiff still does not believe that she was in any way responsible for any of the
acknowledged difficulties she was having with her co-workers.  (Plaintiff V. 3, p. 93)
        Q.    Did you think you had done anything wrong in any of your dealings with any
other of your co-workers at Baystate?
        A.    No.
        Q.    So if any of your co-workers had any trouble dealing with you, none of it was
any of your fault?
        A.    I was always on the defensive, just protecting myself as a human being.  As I'm

significant improvement in Plaintiff's behavior, and therefore there was no reason to allow her probationary period to continue. Thus, since Plaintiff's hiring in late October, management had been informed of numerous problems with Plaintiff's performance and/or interpersonal relationship with the co-workers attempting to train her, and teach her the policies, procedures and expectations of BMC. Her lead person and supervisor had been told by one employee after another that she had, in substance, been rude to them to the point that they could not get long with her and did not wish to work with her. They had been informed that even though she was a probationary employee who needed to be trained, Plaintiff would not listen to instructions or follow directions. The Environmental Services Department had received a signed written petition from a group of Registered Nurses working in the Operating Room complaining about Ms. Woods' performance and behavior, which largely confirmed the other reports being received from her co-workers. In management's view she had been rude and insubordinate to Bailey when he was attempting to investigate Plaintiff's version of the altercation she had had with Ms. Harris. The purpose of the probationary period is to weed out those new hires that do not, for any reason, appear to be good candidates for long term employment. It was obvious to management that Plaintiff was not performing well, was not getting along with co-workers and was unlikely to become a good employee. It was, therefore, decided that Plaintiff would not be made a

---

doing here. Always on the defensive.

regular employee and a decision was made to end her employment with

BMC effective December 9.  (Bailey Aff. ¶ 18; Ex. 3)

39.  Plaintiff filed a charge of discrimination with the Massachusetts

Commission against Discrimination and the EEOC only after she was

terminated.  (Ex. 10; Plaintiff V. 2, pp. 12-13)  There is no evidence of

Plaintiff testifying before, or cooperating with an MCAD or EEOC

investigation prior to her termination.  Nor had Plaintiff filed any internal

complaint alleging that she was being discrimination against or

harassed, although procedures are in place to file such complaints.

(Bailey Aff.  ¶ 19)  The MCAD dismissed the claim, (Ex. 13) and Plaintiff

appealed.  The appeal was dismissed.  (Ex. 14; Plaintiff V. 2, pp. 46-47)

Respectfully submitted,


  /s/ Jay M. Presser, Esq.
Jay M. Presser, Esq.
BBO No. 405760
Counsel for Defendant BMC
Skoler, Abbott & Presser, P.C.
One Monarch Place, Suite 2000
Springfield, Massachusetts  01144
Dated:   December 10, 2004        Tel. (413) 737-4753/Fax: (413) 787-1941

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Motion To Postpone Case Management Conference was electronically filed and served upon the pro se Plaintiff, Barbara Woods at 33 Granville Street, Springfield, MA 01109,  by first-class, U.S. mail, postage prepaid, on December 10, 2004.

/s/ Jay M. Presser
Jay M. Presser, Esq.