UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BARBARA WOODS,<br><br>                Plaintiff,<br><br>vs.<br><br>BAYSTATE HEALTH SYSTEM,<br><br>                Defendant. | CIVIL ACTION NO. 04-30010-KPN<br><br>**AFFIDAVIT OF TODD BAILEY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

I, Todd Bailey, under the pains and penalties of perjury, herein state the following based on first-hand information:

1. At all times relative to the above-captioned matter I have been a Manager of Environmental Services working for Baystate Medical Center ("BMC"). I supervise various custodians working for BMC. I report to Timothy Culhane, the Director of Environmental Services.

2. I interviewed and hired the Plaintiff, Barbara Woods, to be a third shift custodian in the fall of 2002.

3. At that time there were no managers assigned to the third shift. Instead, managers like me, who worked the day shift, shared oversight of third shift employees. A lead custodian, Moira Plummer, was assigned to the third shift. While Ms. Plummer did not have authority to hire or discharge an employee, for example, I would expect her to report any problems arising on the shift to me. She would be responsible for overseeing the training of new employees on that shift, monitoring the performance, and providing the information to me.

4. Certain areas of the hospital, specifically the Operating Room, require that custodians utilize certain procedures when cleaning. It would not be at all unusual for incumbent employees to be made responsible for training new hires in the proper cleaning techniques for their specific area. Ms. Plummer would then regularly speak to the incumbent employees to ascertain how the new hire was progressing.

5. On Ms. Woods' first night of training in the Operating Room, she was being trained by Don Potter, a custodian. It was reported to me that Mr. Potter had made a comment to Ms. Woods which had upset her. As reported, Mr. Potter was with Ms. Woods when he spotted her brother Danny, another BMC employee. According to what Mr. Potter told me, when he saw Danny Woods he stated to Barbara Woods "here comes your brother's ugly mug." Ms. Woods' version of what was said was not materially different, as she claimed he said here comes your ugly brother. There was never any allegation that there had been any racial epithet used, or comment other than what is stated above.

6. Nevertheless it was clear that Ms. Woods was upset by the comment. She indicated that she believed that it was a racial comment and demonstrated that Mr. Potter was prejudiced against blacks. I spoke to Mr. Potter, who never denied making the comment, but insisted he had just been making a joke.

7. I believed that Mr. Potter had made an inappropriate comment, since he did not know Ms. Woods' well enough to be confident that she would not take offense by such a comment, even if intended as a joke. However, I did not believe that it was intended, or reasonably could be interpreted, as a racial slur, as Ms. Woods contended. Many of the custodians who work with Mr. Potter, including the lead custodian, Ms. Plummer, Annie Gamble and Caroline Anzeze, all of whom were involved with Ms. Woods training, were also black. There had never been any complaints raised about Mr. Potter's behavior by these employees. Ms. Plummer indicated that when she spoke with witnesses it was their belief that Mr. Potter had intended it as a joke. Moreover, knowing Mr. Potter, and the manner in which he jokes, it seemed to be that his comment was nothing more than an unsuccessful, and ill-conceived, attempt at humor.

8. Nevertheless, over the course of the next few weeks we had several meetings regarding the comment, even though I had thought the matter had been resolved during one of the early meetings. During the course of these various meetings, I tried to convey to Ms. Woods that while the comment was rude and inappropriate, I didn't think it was racially motivated. Nevertheless, Potter was counseled that making such comments, which co-workers found to be offensive, was unacceptable and would not be tolerated. He indicated that he would not do so again. Later Mr. Potter indicated that he was upset at being accused of being prejudiced against blacks as a result of a comment he insisted was simply intended as a joke. He indicated that in his view he had already apologized to Ms. Woods when he realized she had taken offense to his "joke."

9. Neither Mr. Potter's comment, nor Ms. Woods' apparent belief that the comment was a racial slur, played any role in any subsequent personnel action relating to Ms. Woods. Thus, while I didn't think that the matter was a racial slur, I agreed that it was inappropriate. The subsequent actions taken against Ms. Woods, including the decision not to hire her as a regular employee, were solely a result

of her own conduct and her problems with co-workers, many of whom were black themselves.

10. Virtually all new hires at BMC, including Ms. Woods, are considered probationary employees for the first ninety days of their employment. During the course of the probationary period, managers are expected to closely monitor the performance of the new hire to determine whether the new hire is someone who is suitable for continued employment. This is the written policy of BMC and new hires are informed about the policy when hired. Since such probationary employees are not yet considered regular employees, the policies that are generally followed for termination of post-probationary employees do not apply. For example, a post-probationary employee who is terminated can utilize a grievance procedure to contest his or her discharge. Progressive discipline is, in most cases, used when terminating a post-probationary employee. In contrast, a decision not to retain a probationary employee does not require that progressive discipline be used. An employee may have a perfectly clean record, in the sense that no discipline has ever been issued, and the manager remains free to not continue the employee beyond the introductory period should the manager, after having had the opportunity to assess the probationary employee's performance on the job, believes the new hire is not well suited for the position, or for any lawful reason is not a good candidate for continuing employment. That determination can be made at any time during the 90 day introductory period.

11. Based on numerous reports and my personal observations, it became clear to me that Ms. Woods should not be offered continuing employee status at BMC. Thus, Ms. Woods initially was being trained to be a custodian in the Operating Room. She was being trained by Ann Gamble and Caroline Anzeze. The reports I received I received both through Ms. Plummer and directly from various employees who had interacted with Ms. Woods, was that Ms. Woods was extremely difficult to work with and resistant to being trained in the proper techniques. Based on the manner in which Ms. Woods had dealt with them while trying to train Ms. Woods, Gamble and Anzeze both had indicated that they did not wish to continue working with or training Ms. Woods. I had personally seen valued employees, including Ms. Plummer and Ms. Gamble, reduced to tears while interacting with Ms. Woods or discussing their interactions with Ms. Woods. Both Ms. Gamble and Ms. Anzeze were black employees, and I had no reason to believe that any of the difficulties that they were having dealing with Ms. Woods was related to Ms. Woods' race, as opposed to Ms. Woods' often rude manner of dealing with others. I personally found Ms. Woods difficult to deal with. While as a manager you always prefer that a candidate you have hired succeeds, whenever I tried to address concerns with her that would impede her chances of becoming a regular employee Ms. Woods would deny any culpability or responsibility for problems she was having, always blaming others or denying the problems. At one point I told her, truthfully, that it might be

different if only one person was reporting problems dealing with her, but that I had trouble believing that so many people would be making these things up.

12. I took notes of some of my meetings with Ms. Woods and some conversations with employees that related to Ms. Woods. These notes, which were marked deposition exhibits 1, 3, 4, 5, 7, 9, and 11, were prepared at the time and all accurately reflect what things that were reported to me or my recollection of what happened at the time. These exhibits are attached to Attorney Presser's affidavit in support of the Motion for Summary Judgment.

13. In late November, just a few weeks after she had begun work, I was given a three page document that was signed by eight different nurses from the Operating Room, complaining about Ms. Woods. The fact that a written petition of complaint was sent by the nursing staff was most unusual, and I took it indicative of the depth of their concern regarding problems relating to Ms. Woods' in the operating room. The petition (attached to Presser's affidavit) complained about poor cleaning by Ms. Woods, her failure to follow procedures and directives, including directives to cover her hair properly and not touch items with dirty gloves, poor personal interactions with others, and perhaps most troubling, the fact that Ms. Woods would not listen to instructions that Annie Gamble was trying to convey. The complaint, consistent with what I had been hearing, concluded by indicating:

> *"Barbara was very disruptive to this environment. She was rude & offensive when speaking with her. She was especially inappropriate and rude when speaking with Annie. Annie was trying to teach her how to clean this room the right way. Barbara always had some curt answer back. She did not care who she said it in front of."*

14. To the best of my recollection, the only one I shared this written complaint with, prior to the litigation of this case before the Massachusetts Commission Against Discrimination, was my Director, Mr. Culhane.

15. Shortly after receipt of the complaint, after consulting with Mr. Culhane, we decided to give Ms. Woods a fresh start and try to have her train in the emergency department. We decided to try this since Ms. Woods' behavior had already alienated the operating room nurses and the custodians assigned to train her in the operating room cleaning procedures, Ms. Anzeze and Ms. Gamble to the point that neither wanted to work with her, and because we were receiving what was in my tenure with BMC an unprecedented level of complaints about Ms. Woods' performance in the Operating room. The decision to try the emergency room was made with the hopes that she would do better there than she had during her time in the Operating Room. She did not.

16. Rather, on November 24, 2002, within a few hours of being assigned to the Operating Room, Ms. Woods had a confrontation with Annette Harris, another custodian who worked in the Emergency department. When I reported to work I learned that Ms. Harris wanted to discuss something with me. I went to see her, and when discussing what had happened during the prior night shift, Ms. Harris, a valued employee, became so upset she began to cry. Ms. Harris relayed to me that she had observed Ms. Woods sitting in an area of the emergency department where custodians are not supposed to be seated. She indicated that she had attempted to inform Ms. Woods of that fact but that Ms. Woods then snapped at her, telling her that it was none of Ms. Harris' business where Ms. Woods was sitting. Perhaps surprised by this curt response from a probationary employee, Ms. Harris reported to me that she then told Ms. Woods that if someone had told her that she was sitting in an area that she was not supposed to be in, she would have apologized, and said that she didn't know she was supposed to be there. According to Ms. Harris, Ms. Woods responded, "Oh well, that's just you." It was clear to me that Ms. Harris was greatly upset by this episode and the disrespect shown to her by Ms. Woods when she was merely, and appropriately, trying to inform her that she should not be sitting in that area. Ms. Harris is a good employee. She is also black, and I had no reason to believe that either Ms. Harris' reports regarding Ms. Woods', or Ms. Harris' reaction to the episode, were related to Ms. Woods' race.

17. Notwithstanding the fact that Ms. Woods' was now being trained in the Emergency Department on the third shift, I continued to be her direct supervisor. After having spoken with Ms. Harris I decided I needed to speak with Ms. Woods to learn her version of what happened with Ms. Harris. A meeting was held on November 27, at the end of her shift, with Burt Alves, another supervisor, myself and Ms. Woods present. When told that, I viewed this as a serious issue that she should respond to Ms. Woods claim that she was being harassed. She then began to talk to Mr. Alves and to ignore me. I indicated that it was advisable for her to address what had happened with Ms. Harris, at which point she held her hand up in front of me, and said I am not talking to you, I am talking with Burt. I spoke up to indicate that I remained her direct supervisor and was entitled to ask her questions. She continued to ignore me but soon thereafter she got up and left the meeting. I viewed this behavior as both rude and insubordinate. She was later issued a formal disciplinary warning for her conduct with Ms. Harris and towards me at the meeting.

18. The fact that the problems with Ms. Woods and a co-worker had arisen immediately after we had transferred Ms. Woods to the Emergency Department to give her an opportunity for a fresh start, her behavior at the meeting of November 27, and the history of the problems she had had when in the Operating Room, soon led to discussions as to whether Ms. Woods was likely to be offered regular employment. Given her attitude I could see no reason why we could expect a significant change in behavior. Ms. Woods never accepted any

responsibility for any of the difficulties she was having with the other employees, and whenever criticism was offered she would respond by attacking the behavior of our incumbent employees, team leaders, or managers. Therefore, there was no reason to let her probationary period continue. Indeed, since her hiring in later October, I had been informed of numerous problems with Ms. Woods' performance and/or interpersonal relationship with the co-workers attempting to train her, and teach her the policies, procedures and expectations of BMC. Moira Plummer and I were being told by one employee after another that she had, in substance, been rude to them to the point that they could not get along with her and did not wish to work with her. Plummer and I had been told that she would not listen to instructions or follow directions. We had received a signed written petition from a group of Registered Nurses working in the Operating Room complaining about Ms. Woods' performance and behavior, largely confirming the reports we had been receiving from her co-workers. She had, in my mind, been rude and insubordinate to me, especially on the occasion when I was attempting to investigate Plaintiff's version of the altercation she had had with Ms. Harris, immediately after our decision to try to salvage her position by transferring her to the emergency department. It is my understanding that under our policies the purpose of the probationary period is to weed out those new hires that do not, for any reason, appear to be good candidates for long term employment, whether because the employee displays a bad attitude, an inability to do the job hired for, an inability to work with others, or any other reason that would prevent someone from being a valuable addition as a regular employee. Based on everything that I had seen, or had been reported to me, it was obvious that Ms. Woods was not performing well, was not getting along with co-workers, and was unlikely to become a good employee. Mr. Culhane, with whom I discussed these issues, was in agreement. It was, therefore, decided that Ms. Woods would not be made a regular employee and a decision was made to end her employment with BMC effective December 9.

19. BMC has procedures that allow employees to file internal complaints if they believe that they have been harassed or discriminated against. Ms. Woods never filed such a complaint. Moreover, even as to the comment regarding Mr. Potter, Ms. Woods never came to management asking that we take any action based on the comment. We investigated and responded because we learned that Mr. Potter had made an inappropriate comment that had offended a co-worker. No employment decision relating to Ms. Woods was related to her race, or to the fact that Don Potter had made the comment about her brother on the first day of her employment.

I hereby swear that the above statements are true and accurate to the best of my knowledge and belief.

_____*Todd Bailey*_____
Todd Bailey

Sworn and Subscribed to before
Me this 7th day of December, 2004:

_____*Kathleen A Hall*_____
Notary Public
My Commission Expires: 08/09/07