# EXHIBIT D

*COMMONWEALTH OF MASSACHUSETTS*
*COMMISSION AGAINST DISCRIMINATION*

BARBARA WOODS,

Complainant,

vs.

BAYSTATE HEALTH SYSTEMS, INC.,
Respondent.

MCAD CASE NO. 03-SEM-00714

## RESPONDENT'S STATEMENT OF POSITION

Charging Party has filed a charge against Respondent Baystate Health Systems, Inc. (hereinafter "Baystate") alleging that she was discriminated and retaliated against due to her opposing what she believed were racially derogatory comments. The allegations are denied.

### Response to Specific Allegations Of The Charge

1. The allegations of Paragraph 1 are admitted.

2. The allegations of the first sentence in Paragraph 2 are admitted. Respondent admits the second sentence in Paragraph 2 insofar as on Wednesday, October 23, 2002, Complainant's co-worker Don Potter, a Custodian, who was training her in the Operating Room, made a comment about her brother, Danny Woods, who also works as a custodian in the Environmental Service Department. Respondent, however, denies that it was based on his race (African American). Respondent clarifies that on the third day of Complainant's employment she commented that she had not seen her brother yet and was wondering where he was. At that time Mr. Potter and Complainant were close to the entrance doors to the OR which have glass windows. When Mr. Potter looked through the glass windows he realized that Mr. Woods was on the other side of the doors and commented to Complainant, "Hey, there's his ugly mug in the window now."

BARBARA WOODS V. BHS   CASE NO.: 03-SEM-00714
RESPONDENT'S STATEMENT OF POSITION

3. The allegations of Paragraph 3 are admitted insofar as Complainant did voice to Mr. Potter that she did not like him calling her brother ugly. Respondent adds that Mr. Potter told Complainant that he felt he and Mr. Woods were friends and he did not think Mr. Woods would be offended by such a statement. Mr. Potter told Complainant that her brother and he jokingly went back and forth i.e. Dan called Don Dan, and Don called Dan Don. Mr. Potter said Complainant told him her brother did not play like that. Mr. Potter immediately told Complainant he was sorry and apologized if the comment had offended her. Mr. Potter told Complainant he would not do it again because he did not want to offend Complainant Respondent denies that Complainant called Mr. Potter prejudiced on that occasion.

4. The allegations of Paragraph 4 are denied. Respondent clarifies that the following day when Mr. Todd Bailey, Operations Supervisor, approached Mr. Potter to see how the training of Complainant was going, Mr. Potter informed Mr. Bailey he thought he offended Complainant because he had made the comment about her brother's "ugly mug". Mr. Potter told Mr. Bailey that he had apologized and thought things were all right.

Respondent adds that within a few days after Mr. Potter made the comment about Complainant's brother, Mr. Potter heard that Complainant was calling him "prejudiced". When this was brought to Mr. Bailey's attention he scheduled a short meeting between Mr Potter and Complainant to address and resolve the matter. When Complainant was asked if she recalled Mr. Potter apologizing to her already, she said she did not remember him doing so. Complainant told Mr. Bailey Mr. Potter had called her brother "ugly" and thus he was prejudiced. When Mr. Potter asked Complainant how making such a comment could make him prejudiced, Complainant replied that Mr. Potter would not have made the comment to a White person, and that Mr. Potter thought all Black people were ugly. Mr. Potter questioned Complainant how she could say that and told her she did not know him.

2

BARBARA WOODS V. BHS  CASE NO.: 03-SEM-00714
RESPONDENT'S STATEMENT OF POSITION

Mr. Potter was very offended by the accusation because nobody had ever called him prejudiced before. Mr. Potter was so upset by the interaction that he was ready to quit that day but Mr. Bailey talked him into staying.

When Mr. Bailey asked Complainant if she felt comfortable with the outcome of the meeting Complainant stated she did. Thus, Mr. Bailey did not feel the need to make any changes in the training schedule and Mr. Potter continued training Complainant for the next 3 to 5 days as originally scheduled.

Mr. Bailey later on discussed with Mr. Potter the inappropriateness of the comment, told him it was not in conformance with the Health System's Operating Principles and would not be tolerated. Mr. Bailey gave Mr. Potter a copy of the Operating Principles with behaviors as a development tool for future interactions. Mr. Potter assured Mr. Bailey that he would not make comments like this again. This conversation was documented in **Exhibit No. 1**.

5. Respondent denies the first sentence in paragraph 5. Respondent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of Paragraph 5. Respondent does admit, however, that Mr. Bailey asked to meet privately with Complainant.

6. Respondent admits the first sentence in paragraph 6 as written. Respondent clarifies that Mr. Bailey continued to hear that Complainant was calling Mr. Potter prejudiced even though he thought they had already discussed the issue and felt it had been resolved. Mr. Bailey had hired Complainant into the third shift custodian position in the OR which was a very difficult to fill position and thus he wanted her to succeed in the position. Mr. Bailey wanted

BARBARA WOODS V. BHS  CASE NO.: 03-SEM-00714
RESPONDENT'S STATEMENT OF POSITION

to know what she considered prejudiced about the comment made by Mr. Potter. Respondent denies the second sentence in paragraph 6.

7. Respondent admits the allegations contained in paragraph 7. Respondent clarifies that Mr. Bailey met with other Custodians from the OR who were also involved in the training of Complainant. They told Mr. Bailey they continued to hear that Complainant was saying Mr. Potter was prejudiced and indicated they were also having other serious problems with Complainant. As an example, Mr. Bailey was informed by Ms. Ann Gamble, an African American custodian, about several inappropriate comments Complainant had made toward her when she was training Complainant in the Operating Room. Ms. Gamble said on her third day of training Complainant in Post Anesthesia Care Unit (PACU) that Complainant was accusing her of "watching over her like a slave", asked Ms. Gamble "why she must be so nosey and constantly be checking up behind her". See **Exhibit No. 2**. Mr. Potter also told Mr. Bailey that Complainant had accused him of following her around, sneaking up on her and accused him of spying on her when he was training her. In addition, another African female custodian, Ms. Caroline Anzeze, said during her second week of training Complainant was kneeling down clearing the bottom edges of an OR table, when Ms. Anzeze bent down to tell Complainant something. Startled, Complainant jumped up and Ms. Anzeze's latex glove accidentally brushed up along the side of Complainant's face. Complainant accused Ms. Anzeze in a loud toned voice not to ever touch her again, and asked her what she thought she was doing. Ms. Anzeze told Complainant it was only an accident and that she was sorry for any problem she might have caused. See **Exhibit No. 3**.

Mr. Bailey explained to Complainant that the reason why Ms. Gamble and others needed to follow up on the work she had done was to validate that Complainant was performing her

4

job in accordance with the training she received. The cleaning necessary in the OR's and PACU had to be very detailed since sanitation was of utmost concern given the need for a sterile environment where surgical procedures had to be performed. At the conclusion of the meeting Mr. Bailey felt assured that Complainant understood the importance of her learning the right procedures and the need for others to follow up to assure she would be able to function on her own once she was fully trained.

8. Respondent denies the allegations in paragraph 8. Respondent clarifies that a few days later when Mr. Bailey saw Complainant in the hallway he told her he thought she was over sensitive to the role other custodians had when training her. He further explained that they were responsible to assure Complainant was learning the appropriate procedures required when cleaning areas such as operating rooms, rooms where contagious patients had been operated on, and Post Anesthesia Care Unit, etc. Respondent denies that Mr. Bailey told her he was going to write her up because a co-worker had complained due to the fact that Complainant had asked her where she was going.

9. Respondent admits the allegations in paragraph 9, however, clarifies that because rumors about Mr. Potter being prejudiced kept on resurfacing, Mr. Bailey and Mr. Tim Culhane, Director, Environmental Services, scheduled a meeting to discuss the issue with Complainant's brother, Mr. Dan Woods. Mr. Woods commented that it was an insult to he because his sister did not know Mr. Potter and he had made the comment the first day she was on the job. She was offended and thought it was racist. Mr. Woods said the comment should not have been said. He told his manager that he did not feel he had been discriminated against, however, he felt it was not something nice to say about him. Mr. Woods was informed that BHS did not tolerate such comments, they had already addressed the issue with Mr. Potter and he had already apologized to the Complainant.

BARBARA WOODS V. BHS  CASE NO.: 03-SEM-00714
RESPONDENT'S STATEMENT OF POSITION

When Mr. Woods was interviewed later on he reiterated what had been said during his meeting with Mr. Culhane and Mr. Bailey and added he did not think the same way his sister did, but other family members took it differently, his sister was upset by it. Mr. Woods said had the comment been made directly to him he might have laughed it off, and said since he started working in the department he and Mr. Potter joked around each time they saw each other calling Don Dan and Dan Don.

10. Respondent denies the allegations in paragraph 10. Respondent clarifies that Complainant was informed they had spoken to her brother and she was assured that a statement such as the one made about her brother would not be said again. They also discussed the idea of moving Complainant to another area to continue her training in other critical care areas. Since Complainant appeared to be having conflicts with the staff in the Operating Room and Mr. Bailey wanted her to succeed in her new position, he felt she should be given an opportunity to try working in another area, such as the Emergency Department. During the discussion, Complainant did not question or object to the change, in fact, according to Mr. Bailey she appeared to embrace the idea of a change.

11. Respondent admits the allegations in paragraph 11.

12. Respondent admits the allegations in paragraph 12. Respondent clarifies that on Complainant's first night of training in the Emergency Department in mid November, 2002, a female, African-American co-worker, Ms. Annette Harris, who was training her, approached Complainant to let her know that she was sitting in an area in the Emergency Department where Custodians were not supposed to sit. Complainant responded by saying, "I heard you but, it is none of your business where I sit." Ms. Harris then commented to

BARBARA WOODS V. BHS  CASE NO.: 03-SEM-00714
RESPONDENT'S STATEMENT OF POSITION

Complainant, "If anyone had told me that I couldn't sit in this area I would have said I didn t know and was sorry." Complainant's response was "Oh, well, that's just you." This encounter with Complainant, which took place within the first four hours they worked together, disturbed Ms. Harris so badly that she broke down in tears when relating the incident later on to the lead custodian. See **Exhibit No. 4**.

13. Respondent admits the allegations in paragraph 13. Further explaining the incident, Respondent adds that subsequent to the incident previously described in paragraph 12, on November 21, 2002 Mr. Bailey and Mr. Burt Alves, Operations Supervisor, met with Complainant. The reason for calling the meeting was to have Complainant sign off on training documents verifying she was trained in the OR and PACU and to notify her of areas where she needed further development. When Complainant read the section related to ongoing development issues that she needed to work on related to collaboration and teamwork skills Complainant stated that Mr. Bailey was "trying to trick her to sign something" and that she believed should not have been documented. Complainant refused to sign the training document and a document stating the issue regarding the comment made to her brother had been discussed at length by all parties and the issue was resolved. See **Exhibits No. 5 and 6**.

When Complainant read the section about ongoing development issues she needed to work on Mr. Bailey told Complainant he was referring to the encounters she had with her co-workers who had been training her on all aspects of her job. Mr. Bailey told Complainant she had not been accepting the training from her peers very well. As an example, Mr. Bailey repeated what he heard had recently occurred in the Emergency Department during her first night of training with Ms. Harris. Complainant responded that she could not comment on the matter and that she had to leave.

7

BARBARA WOODS V. BHS  CASE NO.: 03-SEM-00714
RESPONDENT'S STATEMENT OF POSITION

When Mr. Bailey told her of the severity of this matter and suggested Complainant take two minutes to explain her side of the story, Complainant stated at that point that she felt he was harassing her, turned to Mr. Alves and said, "Do you feel that I would do something like that?" Mr. Alves immediately said they would like her statement which Mr. Bailey reiterated would be the best thing to do. Complainant put up her hand in front of Mr. Bailey's face and told him, "I'm not talking to you, I'm talking to Burt". Mr. Bailey informed Complainant that he was her direct report supervisor and that he had the right to ask her questions. Complainant then proceeded to ignore all responses from Mr. Bailey, stood up and walked out of Mr. Alves' office. Thirty seconds later Complainant returned to the office and said she was going to take this matter to an outside source, but mentioned a name so quickly that neither Mr. Bailey nor Mr. Alves could make out what she said and then she left. See **Exhibit No. 7**.

14. Respondent denies the allegations in paragraph 14. Respondent clarifies that on Tuesday, December 3, 2002 Burt Alves and Tracey Malley, another Operations Manager, met with Complainant to discuss a verbal counseling being issued to Complainant for Insubordination for her behavior toward Mr. Bailey during their meeting on November 27, 2002. See **Exhibit No. 8**. Complainant stated she did not agree with the counseling being issued and did not feel she had been insubordinate.

During the conversation Complainant stated that the other employees were lying and it was their word against hers. Mr. Alves explained that when she had met with Mr. Bailey and him on November 27, 2002 they wanted to ask her what had occurred in the Emergency Department on her first night of training. Complainant then stated she had to pick up her kids and did not have time to talk to them that day. Complainant mentioned she did not

8

agree with the documentation Mr. Bailey had prepared and would not sign any paperwork because if she did she would only have 6 months to file a suit. Complainant then stated she would call the NAACP and the newspaper and Mr. Alves would see his name in the paper

Mr. Alves then refocused Complainant back to the insubordinate behavior. Complainant again replied she did not feel she had been insubordinate and that African Americans use their hands during conversations (referring to the gesture when she put up her hand to Mr. Bailey's face). Ms. Malley stated that all different types of people talk using their hands during conversation. Complainant then stated that night in the Emergency Department she "worked like a slave". Mr. Alves stated everyone in the department worked very hard. Complainant then said they should look up the definition of "slave" on the Internet, that there were different definitions. Complainant then inquired if any other employee was given a warning for insubordination. Complainant was informed that they could not discuss any other employee disciplinary actions with her nor discuss hers with anyone else. They emphasized the reason they were meeting was because she needed to correct her behavior or further disciplinary action would be taken.

Ms. Malley offered Complainant an opportunity to make comments but Complainant chose not to. Ms. Malley also gave Complainant the Director of Environmental Services' telephone number in case she wanted to make an appointment to discuss the situation further if she felt necessary. They then recapped the meeting informing Complainant that the verbal counseling would only be placed in her department file and that she was receiving the counseling to help correct her insubordinate behavior. See **Exhibit No. 9**.

15. Respondent denies the allegations in paragraph 15 as written.

## II. **FACTS**

Complainant began her employment in the Environmental Services Department as a full time Custodian on the night shift, 11:00 p.m. to 7:00 a.m. on October 21, 2002. Complainant was hired to work in the Operating Rooms (OR) and Post Anesthesia Care Unit (PACU). A co-worker, Mr. Don Potter, a While male was scheduled to train Complainant during the first two weeks of her training. Mr. Potter said during the period he was training Complainant he was responsible to go into the rooms after Complainant had cleaned them to check her work to make sure she had done the work correctly. Mr. Potter said Complainant accused him of following her around, sneaking up on her.

On October 23, 2002, Complainant commented she had not seen her brother yet and was wondering where he was. Complainant's brother, Mr. Dan Woods also worked as a project worker in the Environmental Services Department. At that time Mr. Potter and Complainant were close to the entrance doors to the OR which have glass windows. When Mr. Potter looked through the glass windows he realized that her brother Mr. Woods was on the other side of the doors and commented to Complainant, "Hey, there's his ugly mug in the window now". This comment allegedly offended Complainant, telling Mr. Potter that she did not like him calling her brother ugly. Complainant did not call Mr. Potter prejudiced when the incident occurred. Mr. Potter immediately told Complainant he was sorry, told Complainant he was friends with her brother and apologized if the statement had offended her. Within a few day after the incident was brought to management's attention, they met with Mr. Potter to let him know his comment was inappropriate and any future comments of this nature would not be tolerated. A meeting was also scheduled between Mr. Potter and Complainant; Mr. Potter apologized once again for

BARBARA WOODS V. BHS  CASE NO.: 03-SEM-00714
RESPONDENT'S STATEMENT OF POSITION

his actions. At that time Complainant called Mr. Potter prejudiced for having made the comment. Complainant told Mr. Bailey Mr. Potter had called her brother "ugly" and thus he was prejudiced. When Mr. Potter asked Complainant how making such a comment could make him prejudiced, Complainant replied that Mr. Potter would not have made the comment to a White person, and that Mr. Potter thought all Black people were ugly. Mr. Potter questioned Complainant how she could say that and told her she did not know him. After further discussion, Mr. Bailey believed they had resolved the issue and Complainant had accepted Mr. Potter's apology. Later on when Mr. Bailey heard Complainant continued to call Mr. Potter prejudiced Mr. Bailey also met with Complainant's brother. Mr. Woods indicated he did not feel he had been discriminated against, would not have been offended if it had been said to him, he might have laughed it off, but did think the comment should not have been said to his sister, who considered it an insult and racist.

As stated previously, Complainant was hired to work in the OR and PACU. However, within a short time after Complainant began her training it became evident that there were a series of problems related to Complainant's behavior that could not be tolerated. In mid November, 2002 during her initial training period eight nurses and/or other staff members from the OR documented a list of problems related to Complainant's behavior while being trained and brought them to management's attention.

The main problem the nurses had observed was that Complainant would not listen and take constructive training from Ms. Annie Gamble, an African American Custodian, assigned to train Complainant. Among the problems documented by the staff were that Complainant seemed to be always talking when she needed to be listening. When Ms. Gamble was showing Complainant how to meet Baystate Medical Center's standards for cleanliness in a MRSA room (an operating room where a contagious patient had undergone a surgical procedure), Complainant was not paying attention and started talking to another nurse. When Complainant

was asked to clean another MRSA after being trained Complainant did not clean all the necessary areas of the room and she would spray # 8 disinfectant and wipe it off immediately when she had just been shown and told that a minimum dwell time of 10 minutes was required in order for it to be effective. Furthermore, upon exiting the room Complainant would touch walls and sink areas with her dirty gloves. When she was told to remove her gloves and gown, Complainant ignored the nurse's instructions and went on her business continuing to touch many other surfaces. Complainant took the gloves off a few minutes later at her own discretion.

On other occasions Complainant placed foot stools and standing mats on clean OR tables; she carelessly pushed around expensive microscopes; she did not return the rooms to their proper set up after cleaning them; and Complainant over-reacted to staff who came near her with clean gloves on.

Another issue brought up by the OR nursing and surgical staff was that when Complainant was instructed about the proper way to cover her hair in a sterile environment to prevent falling hair Complainant refused not comply with their instructions. Complainant asked them "if the hair (they found) was African America" and said "the hair found could not be hers." Complainant continued to walk around the PACU area without properly covering her hair.

The staff in the OR stated they felt Complainant was very disruptive to their environment. They stated Complainant was inappropriately rude and offensive when she spoke to them, and especially when she spoke to the co-worker who was training her, Ms. Annie Gamble. The staff also stated Complainant always seemed to have an unkind remark back to anyone when they advised her on proper procedures. The staff remarked that it appeared as though Complainant did not care who she said her comments in front of, including patients in the PACU area. This behavior is extremely unacceptable. See **Exhibit No. 10**.

Ms. Gamble, an African American, also shared her unpleasant experience training the Complainant with her supervisor, Mr. Bailey on November 19, 2002. According to Ms. Gamble, on her third day of training Complainant in PACU Complainant accused Ms. Gamble of "watching over her like a slave" and asked her "why must she be so nosey and constantly be checking up behind her." Ms. Gamble said by the end of that night Complainant stated she knew everything there was to know about PACU and its accompanying areas. Ms. Gamble said Complainant questioned her twice as to where she had been when Ms. Gamble had to leave momentarily to take care of business elsewhere and returned shortly thereafter. According to Ms. Gamble, the following week, when the regular lead custodian for that area was absent, another lead custodian needed Ms. Gamble to help out in other areas of the hospital. Thus, Ms. Gamble needed to discontinue Complainant's training for short periods of time. When Ms. Gamble returned to the PACU Complainant commented that Ms. Gamble "shouldn't be out wandering around the hospital talking to people and not doing any work."

On the last day of training Complainant in the PACU area Ms. Gamble told Complainant she would be on her own for most of the night to determine if Complainant could handle cleaning the area by herself. Four or five hours into the night Ms. Gamble said Complainant was questioning why Ms. Gamble was not helping her clean the area. Ms. Gamble told Complainant that commencing the following week she would be on her own and that Complainant needed to prove that she was able to do the work without any assistance. Ms. Gamble said Complainant told her she was being lazy.

When Ms. Gamble met with Mr. Bailey to discuss her negative experiences with Complainant, she became extremely distraught and pleaded with him so she would not have to work with Complainant again. See **Exhibit No. 2**.

Another custodian who was asked to train Complainant, Ms. Caroline Anzeze, an African female, also had a negative interaction with Complainant. She informed Mr. Bailey that during her second week of training Complainant, when Complainant was kneeling down clearing the bottom edges of an OR table, Ms. Anzeze bent down to tell Complainant something. Complainant jumped up, startled and Ms. Anzeze's latex glove accidentally brushed up along the side of Complainant's face. Complainant accused Ms. Anzeze in a loud toned voice not to ever touch her again, and asked her what she thought she was doing. Ms. Anzeze told Complainant it was only an accident and that she was sorry for any problem she might have caused. See **Exhibit No. 3**.

Mr. Bailey had hired Complainant into a very hard to fill position and he wanted her to be successful in her new job. However, as a result of these many complaints, he met with Complainant to discuss the need to train and try her in other areas of the hospital such as the Emergency Department. Complainant did not object to the change.

On November 24, 2002 <u>during her first night</u> of training in the Emergency Department, Complainant was approached by a fellow custodian, an African America female, who let Complainant know that she was sitting in an area in the Emergency Department that was not an area where custodians were allowed to sit. Complainant responded by saying, "I hear you but, it is none of your business where I sit". The other custodian replied by stating, "If anyone had told me that I could not sit in this area that I would say I didn't know and was sorry". Complainant responded "Oh well, that's just you." This encounter with Complainant disturbed her co-worker so much that she broke down in tears after having worked together a matter of only four (4) hours. See **Exhibit No. 4**.

BARBARA WOODS V. BHS  CASE NO.: 03-SEM-00714
RESPONDENT'S STATEMENT OF POSITION

On November 27, 2002 Mr. Alves and Mr. Bailey met with Complainant to have her sign off on training documents and to give her feedback regarding suggestions for further development. Mr. Bailey told Complainant about the incident he had been made aware of in the Emergency Department, quoted her statements and asked her to explain her actions. Complainant said she could not comment on the matter and that she had to leave. When Mr. Bailey told Complainant of the severity of this matter Complainant stated she felt Mr. Bailey was harassing her and turned to Mr. Alves and asked, "Do you feel that I would do something like that?" Mr. Alves immediately replied that they would like her statement and Mr. Bailey reiterated that would be the best thing to do at that point. Complainant put her hand up in Mr. Bailey's face and responded by saying, "I'm not talking to you. I'm talking to Burt." Mr. Bailey informed Complainant that he was her direct report supervisor and that he had every right to ask her questions. Complainant then proceeded to ignore all responses from Mr. Bailey. She stood up and to walked out of Mr. Alves' office. Thirty (30) seconds later she came back down the hall and said she was going to take this matter to an outside source and quickly mentioned a name that neither Mr. Alves or Mr. Bailey understood.

As a result of the Complainant's insubordination toward her supervisor, a meeting was held on December 3, 2002 with Complainant to discuss the verbal warning being issued to her. During the meeting Complainant did not agree with this assessment; said other employees were lying; it was her word against theirs; said she would not sign any paper work; threatened to call the NAACP and the newspaper; and threatened Mr. Alves that he would see his name in the paper. See **Exhibit No. 9**.

After Complainant was issued the verbal counseling, Mr. Bailey sat down with Tim Culhane to review Complainant's employment history. Complainant was hired to become an integral part of the 3rd shift Environmental Services Operating room staff. She was only one of four staff working

BARBARA WOODS V. BHS  CASE NO.: 03-SEM-00714
RESPONDENT'S STATEMENT OF POSITION

on the night shift. She was to be a floater, covering other's shifts when they had days off. As a new employee, Complainant needed to complete an initial introductory period which commenced upon her hire and extended for 90 days. The purpose of the introductory period was to monitor and evaluate suitability for continued employment. In the employment offer letter (See **Exhibit 11**), Complainant received dated October 16, 2002, Complainant was informed that if this period was not successfully completed, or at any time during the 90-day introductory period, in accordance with policy, Baystate Health System reserved the right to terminate her employment. See **Exhibit No. 12**.

A review of her brief employment history since her October 21, 2002 date of hire revealed the following: on 10/21/02 she was provided hospital and department wide orientation; on 11/21/02 she was counseled on collaboration, teamwork and Operating Principles; on 11/24/02 an incident occurred while training in the Emergency Department where she made a non-collaborative and insubordinate remark to the person who was training her; and on 11/27/02 she was insubordinate toward her supervisor. In addition to that, because of Complainant's non-compliance and difficulty following instructions instead of taking the average 2 to 3 weeks to be trained, Complainant's training extended into 4 weeks of training. BHS had sufficient business reasons to terminate Complainant's employment during her introductory period. See **Exhibit No. 13**. Thus on December 9, 2002 they met with Complainant to inform her she was being terminated. When Mr. Culhane and Mr. Bailey began to review her probationary period status in detail Complainant became extremely defensive to every detail they had noted. Complainant responded by laughing at them and commented "What a joke this place is". They informed Complainant that the entire Environmental Services management team had handled her employment fairly and with the utmost professionalism. Complainant said she did not want to hear any more from them because they were "two-faced lying hypocrites". After she requested copies of documents, which

were provided to her as she left she stated, you'd "better get all your lies in order and that I'll see you in court". See **Exhibit No. 14**.

Baystate has zero tolerance for discrimination of any kind. See **Exhibit No. 15**. BHS is an affirmative action employer that strives to hire a diverse workforce. The Environmental Services Department is very sensitive to the needs of its very diverse employee population. Of the 190 employees in the Environmental Services Department 68% are minority, of which 34% are African American, 26% are Hispanic and 8% fall under other racial categories.

The comment made by a co-worker toward Complainant's brother (i.e. ugly mug), were not in any manner racial or discriminatory, nor were they perceived as such by Complainant's brother. The employee apologized for this comment immediately after he made it and Baystate addressed the issue without delay after they became aware of the matter. Appropriate steps were taken to assure Complainant such comments would not occur again. Complainant, however, continued to needle her co-workers about the issue, perhaps as a smoke screen to divert attention from the real problems – her poor performance and unacceptable behavior. Within her first 7 weeks of employment, Complainant had conflicts with almost everyone she had to deal with while being trained, most of whom were also African American. She also required extended training since she would not conform to procedures established by the Environmental Services Department. Furthermore, she was insubordinate toward her supervisors. In summary, Complainant's negative performance and behavior during her brief introductory period warranted her employment termination all in conformance with BHS Human Resources Introductory Period Policy. See **Exhibit 11**.

BARBARA WOODS V. BHS  CASE NO.: 03-SEM-00714
RESPONDENT'S STATEMENT OF POSITION

BHS denies Complainant was terminated in retaliation for her opposing a co-worker's discriminatory conduct. Complainant was terminated for her failure to properly perform her job duties during her introductory period.

For all the reasons cited above, BHS respectfully requests that the Commission find a lack of probable cause and dismiss this matter.

I hereby certify that the facts in the above statement are true and accurate to the best of my knowledge and belief. The Respondent is represented by an attorney in this matter.

Respectfully Submitted,

*[signature]*
Elizabeth N. Blaney
Employee Relations Consultant
Baystate Health System
280 Chestnut Street
Springfield, MA 01199
Telephone No: 413-794-7660
Dated: May 27, 2003

Sworn and Subscribed to me before
this 27 day of May, 2003.
Notary Public *Carol Ann Santaniello*
My Commission Expires: 11/12/05

Dated: May 27, 2003

CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing *Respondent's Statement of Position* was served upon the Complainant by first-class, U.S. mail, postage prepaid, on May 27, 2003.

18

BARBARA WOODS V. BHS  CASE NO.: 03-SEM-00714
RESPONDENT'S STATEMENT OF POSITION

_____
Elizabeth N. Blaney