Dear Melvin                    Jan-9-03

Enclosed you shall find a summary of the facts. I will leave my Dept manual with you for review,

Please refer to Section 3 for Job Description and Critera Based Standards I have put brackets around information That may be useful, Section E Section F

(Custodian II position)

(Section 8 - Discipline Policy)
1. (3 2 A)

Section 8 - Harassment in The workplace
(Unlawful Harassment) Section IV
Section V A.

Thank You for Your Time and Patience
Barbara Word

## Brief Summary

On or about October 21, 2002 I began my employment at Bay state Health System I was met by Moira Plummer and brought to my assigned area. In which Miss Plummer inform a co-worker Don Potter [white] to train me. Within four hours of my shift I was subjected to unequal treatment and discriminating intent by Potter when he vehemently states (Here comes your ugly brother who is of African American descent). The following day Potter calls the Direct Supervisor Todd Bailey and informs him of his actions, management elected to continue my training with Potter. Around the end of October or early November my training was completed within the area and a meeting was held, present Todd Bailey [white] Potter, Gamble [black], Plummer [black], Caroline [african immigrant] the meeting was in general until Bailey request a private meeting with me. Bailey informed me and questioned me over and over again to a comment about Potter being saying I said he was prejudiced. I replied no comment at that time. The next day a meeting was held present Plummer, Gamble, Bailey, Bailey inform me to speak freely Plummer verified the statement and defends Potter. Bailey apologies Plummer and Gamble begin to cry. 2 days went by [at end of shift @ 6:00 am] another meeting held Potter, Plummer, Bailey Potter yells and screams and storms out Bailey inform me that I am over sensitive and tells me he is going to write up what another co-worker said about me. Bailey elected to bring my brother in to the manager Tim Callahan even though prior this issue was to held confidential. Management questioned my brother strongly and told him what the word prejudice meant and racism and inquire about me. The next day a meeting was held present

Bailey, Callahan management inform me of my brother responses and stated that I was protected from this harassment but elected to move me to another area I had no choice in the matter and ask management not to hold this against me for using my freedom of speech which resulted in the terminology of the word prejudiced. Burt Ives was know my present direct supervisor I began working in the emergency rooms while ~~that Barbara~~ [not be sitting in the patient sitting room] working there a ~~co-worker~~ [Annette] suggest her opinion about a sitting area I response back to her, hours passed by co-worker called the lead Moira Plummer, at no time did Miss Plummer questioned me about the incident. It was reported to Burt Ives a meeting was held present Ives I was welcomed abroad and Ives spoke constructively about matters, Even though Bailey was no longer my supervisor he chose to investigate the incident further a meeting was held sometime in November present Bailey, Ives, Bailey begin with training papers which I signed then Mr. Bailey questioned me in reference to what a co-worker said I ask him to leave me alone and look from help from my new supervisor the meeting was unsuccessful, The next day Ives elected to write this incident as subordinate but informed me that he would us it as a tool constructively and wrote it up as verbal warning, In retaliation for using the word prejudice anything I said was wrong Mr. Callahan and Mr. Bailey held a meeting in which on Dec. 9 I was terminated for the same alleged charges Mr. Ives wrote up as a verbal I fell victim not only to unequal treatment and intimidation but double jeopardy. In conclusion the above statement are facts.



### The Commonwealth of Massachusetts
### Commission Against Discrimination
### 436 Dwight Street, Rm. 220, Springfield, MA 01103
### Phone: (413) 739-2145 Fax:

## - DISMISSAL and NOTIFICATION of RIGHTS -

To: Barbara Woods
33 Grandvill Street
Springfield, MA 01109

Case: Woods v. Baystate Health Systems/Environment Services
MCAD Docket Number: 032300714
EEOC Number: 16CA301242
Investigator: Karen Dome

Your complaint has been dismissed for the following reasons:

[ ] The facts alleged fail to state a claim under any of the statutes the Commission enforces.

[ ] Respondent employs less than the required number of employees.

[ ] Your complaint was not timely filed with the Commission, i.e. you waited too long after the date(s) of the alleged discrimination to file. Because it was filed outside the time limit prescribed by law, the Commission cannot investigate your allegations.

[ ] You failed to provide requested information, failed or refused to appear or to be available for necessary interviews/conference, or otherwise refused to cooperate to the extent that the Commission has been unable to resolve your complaint. You have had more than 30 days in which to respond to our written request.

[ ] The Commission's efforts to locate you have been unsuccessful. You have had at least 30 days in which to respond to a notice sent to your last known address.

[ ] The Respondent has made a reasonable settlement, offering full relief for the harm you alleged. 30 days have expired since you received actual notice of this settlement offer.

[X] The Commission issues the following determination. Based upon the Commission's investigation, the Commission is unable to conclude that the information obtained establishes a violation of the statutes. This does not certify that the Respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this complaint.

[ ] Other (briefly state)

## - NOTICE of APPEAL -

If you wish to appeal the dismissal of your complaint and believe that the above stated reason for dismissal is incorrect, you may appeal to this Commission within 10 days after receipt of this notice. You or your attorney must make your appeal of the dismissal in writing to the appeals clerk of this Commission. Attention: Migdalia Rivera.

All employment complaints, where applicable, were filed by the MCAD with the Equal Employment Opportunity Commission. Our finding, which will be forwarded to its area office, JFK Federal Building, Boston, MA will be given substantial weight provided that such findings are in accordance with the requirements of Title VII of the Civil Rights Act of 1964, the ADEA, and/or the ADA, as amended.

_Cynthia Tucker_
Investigating Commissioner     Date  7/23/03

Cc: Elizabeth N. Blaney
Baystate Health Systems/Environment Services
280 Chestnut Street
Springfield, MA 01199

**2 page(s) will be printed.** ◀ Back

## Record: 1

| | |
|---|---|
| **Title:** | Chronic stress burden, discrimination, and subclinical carotid artery disease in African American and Caucasian women |
| **Author(s):** | Troxel WM; Matthews KA; Bromberger JT; Sutton-Tyrrell K |
| **Affiliation(s):** | Dept of Psychology, University of Pittsburgh |
| **Source:** | Health Psychology (HEALTH PSYCHOL), 2003 May; 22(3): 300-9 (56 ref) |
| **Publication Type:** | journal article - research, tables/charts |
| **Language:** | English |
| **Major Subjects:** | Stress, Psychological--Complications; Discrimination; Stress, Psychological--Ethnology; Carotid Artery Diseases--Ethnology; Stress, Psychological--Risk Factors |
| **Minor Subjects:** | Funding Source; Female; Blacks; Whites; Socioeconomic Factors; Prospective Studies; Pennsylvania; Adult; Middle Age; Carotid Arteries--Ultrasonography; Body Weights and Measures; Blood Pressure; Hematologic Tests; Pearson's Correlation Coefficient; Psychological Tests; Clinical Assessment Tools; Self Report; Descriptive Statistics; P-Value; T-Tests; Chi Square Test; Step-Wise Multiple Regression; Logistic Regression; Race Factors |
| **Abstract:** | This study examined the association between a composite index of stress that included measures of life events, ongoing stress, discrimination, and economic hardship and subclinical carotid disease among 109 African America and 225 Caucasian premenopausal women. African Americans reported more chronic stress and had higher carotid intima-media thickness (IMT) as compared with Caucasians. Among African Americans only, the composite stress index and unfair treatment were associated with higher IMT. These effects were partially mediated by biological risk factors. African American who reported experiencing racial discrimination had marginally more carotid plaque than did those who did not report experiencing racial discrimination. The results suggest that African Americans may be particularly vulnerable to the burden of chronic stress. |
| **Journal Subset:** | Biomedical; USA |
| **Special Interest:** | Psychiatry/Psychology |
| **Instrumentation:** | Psychiatric Epidemiology Research Inventory Life Events Scale [modified] (Dohrenwend and Dohrenwend) |
| **ISSN:** | 0278-6133 |
| **MEDLINE Info:** | *NLM Serial ID:* H07391000. *NLM UID:* 8211523. |
| **Publisher Info:** | *URL:* http://www.cinahl.com/cgi-bin/refsvc?jid=2189 |
| **Grant Information:** | National Institute on Aging Grant AG12546 |
| **Entry Date:** | 20030801 |
| **Accession Number:** | *2003101258* |
| **Database:** | CINAHL |

© 2003 EBSCO Publishing. Privacy Policy - Terms of Use

**2 page(s) will be printed.** ◀ Back

## Record: 1

| | |
|---|---|
| **Title:** | Chronic stress burden, discrimination, and subclinical carotid artery disease in African American and Caucasian women |
| **Author(s):** | Troxel WM; Matthews KA; Bromberger JT; Sutton-Tyrrell K |
| **Affiliation(s):** | Dept of Psychology, University of Pittsburgh |
| **Source:** | Health Psychology (HEALTH PSYCHOL), 2003 May; 22(3): 300-9 (56 ref) |
| **Publication Type:** | journal article - research, tables/charts |
| **Language:** | English |
| **Major Subjects:** | Stress, Psychological--Complications; Discrimination; Stress, Psychological--Ethnology; Carotid Artery Diseases--Ethnology; Stress, Psychological--Risk Factors |
| **Minor Subjects:** | Funding Source; Female; Blacks; Whites; Socioeconomic Factors; Prospective Studies; Pennsylvania; Adult; Middle Age; Carotid Arteries--Ultrasonography; Body Weights and Measures; Blood Pressure; Hematologic Tests; Pearson's Correlation Coefficient; Psychological Tests; Clinical Assessment Tools; Self Report; Descriptive Statistics; P-Value; T-Tests; Chi Square Test; Step-Wise Multiple Regression; Logistic Regression; Race Factors |
| **Abstract:** | This study examined the association between a composite index of stress that included measures of life events, ongoing stress, discrimination, and economic hardship and subclinical carotid disease among 109 African America and 225 Caucasian premenopausal women. African Americans reported more chronic stress and had higher carotid intima-media thickness (IMT) as compared with Caucasians. Among African Americans only, the composite stress index and unfair treatment were associated with higher IMT. These effects were partially mediated by biological risk factors. African American who reported experiencing racial discrimination had marginally more carotid plaque than did those who did not report experiencing racial discrimination. The results suggest that African Americans may be particularly vulnerable to the burden of chronic stress. |
| **Journal Subset:** | Biomedical; USA |
| **Special Interest:** | Psychiatry/Psychology |
| **Instrumentation:** | Psychiatric Epidemiology Research Inventory Life Events Scale [modified] (Dohrenwend and Dohrenwend) |
| **ISSN:** | 0278-6133 |
| **MEDLINE Info:** | *NLM Serial ID:* H07391000. *NLM UID:* 8211523. |
| **Publisher Info:** | *URL:* http://www.cinahl.com/cgi-bin/refsvc?jid=2189 |
| **Grant Information:** | National Institute on Aging Grant AG12546 |
| **Entry Date:** | 20030801 |
| **Accession Number:** | *2003101258* |
| **Database:** | CINAHL |

© 2003 EBSCO Publishing. Privacy Policy - Terms of Use

EXHIBIT ℰ
Bailey
DATE 9-21-04
S. ROY, RPR

Recap-Please see attached

11-18-02

This document is from the 3rd shift Operating Room staff in the Centennial building.

In the short time that Barbara Woods was assigned to the OR and PACU areas many problems arose. The biggest problem was that Barbara would not listen and take constructive training from Annie Gamble. She seemed to be always talking when she needed to be listening. When Annie was showing Barbara the proper way to clean a MRSA room to meet BMC standards, she was not paying attention and started talking to another nurse. When Barbara was asked to clean another MRSA after being trained she did not clean all areas of the room that needed to be and she would spray # 8 disinfectant and wipe off immediately when she was just shown and told that a minimum of 10 minutes dwell time is required. Upon exiting the room Barbara proceeded to touch walls and sink areas. When I told her that she needed to remove her gloves and gown, she ignored me and went on her business continuing to touch many other surfaces. She took them off a few minutes later at her own discretion.

When told by our staff about properly covering her hair in a sterile environment to prevent falling hair she assumed we found hair and asked us "if the hair was African American" and said "the hair found could not be hers". How could she know this? She continued to walk around the PACU area without properly covering her hair.

We (OR staff) feel that Barbara is very disruptive to our environment. She is inappropriately rude and offensive when speaking with her, especially to Annie. Barbara always seems to have an unkind remark back to anyone when advised on proper procedures. She doesn't care who she says her comments in front of, including <u>patients</u> in the PACU area.

Sincerely,

In the time Barbara was assigned to cleaning the PACU many problems arose. The PACU was not cleaned efficiently, properly, or thoroughly per environmental service standards. Dusting was not done. The biggest problem was the isolation room that had a MRSA pt, which was not cleaned by BMC MRSA standards. Barbara was there taught by Annie the proper procedure. I was here that night when Annie tried to teach her. Barbara would not listen to the instructions. She was talking the entire time Annie was trying to show her what to do. We tried to explain that she only needed gloves, and this was the appropriate precautions. She did not listen and did not understand the correct precautions. The MRSA room was not cleaned appropriately. Blue Skies needs to sit on surfaces to work appropriately. She would spray and wipe. Once done cleaning the MRSA room she proceeded to touch things outside the room with dirty gloves. I stopped her and told her she needed to deglove + degown when leaving the MRSA room. She still did not and then touched the sink and towel dispenser outside the MRSA room. →

EXHIBIT 4
Plummer
DATE 9-24-04
S. ROY, RPR

Barbara was very disruptive to this environment. She was rude & offensive when speaking with her. She was especially inappropriate & rude when speaking with Annie. Annie was trying to teach her how to clean this room the right way. Barbara always had some curt answer back. She did not care who she said it in front of.

Molly S Carlin RN
Michelle Forcier, RN

# DEPARTMENT OF ENVIRONMENTAL SERVICES

## UNIFORM AND ATTIRE POLICY

### PURPOSE
Standardize the attire that is worn by all representatives of the Department. Also, to insure a professional appearance of all staff and establish procedures for ensuring compliance with the policy.

### POLICY

A. **Attire**

All members of the Department will be appropriately attired at all times while on duty. This includes a clean uniform for all custodians and lead custodians, including:

1. Polo shirts, for the men and Berry Pincord tops, for the ladies
2. Navy blue pants, for the men and Berry Pincord pants or a dress for the ladies
3. Clean footwear (no open toe shoes)
4. Badge

B. **Standards**

Uniforms will be worn in the manner in which they are provided:
1. Shirts to be buttoned and tucked in
2. Badges must be visible at all times and not defaced

C. **Compliance**

Employees are expected to comply with this policy. Employees who report for duty with an incomplete uniform, will not be allowed to work. Noncompliance will result in the employee being counseled/disciplined in accordance with BMC Personnel Policies.

Loss or damage of uniforms will result in action designated in personnel policies.